Ethel Louise HILL, Plaintiff–
Appellant,

v.

LOCKHEED MARTIN LOGISTICS
MANAGEMENT, INCORPORAT-
ED, Defendant–Appellee.

No. 01–1359.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 2001.

Decided Jan. 7, 2003.

**ARGUED:** Ronald A. Rayson, Knoxville, Tennessee, for Appellant. Andreas Neal Satterfield, Jr., Haynsworth, Baldwin, Johnson & Greaves, L.L.C., Greenville, South Carolina, for Appellee. **ON BRIEF:** David A. Burkhalter, II, Knoxville, Tennessee, for Appellant.

Before MICHAEL and TRAXLER, Circuit Judges, and GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge GOODWIN joined. Judge TRAXLER wrote a dissenting opinion.

## OPINION

MICHAEL, Circuit Judge.

Ethel Louise Hill sued her former employer, Lockheed Martin Logistics Management, Inc. (Lockheed), claiming that she was fired because of her sex and age and that she was reprimanded and ultimately fired in retaliation for her complaints of discrimination. Hill asserts her claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.;* the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.;* and the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* Hill appeals the district court's award of summary judgment to Lockheed on all of her claims.[1] We conclude that Hill has proffered direct evidence of sex and age discrimination in the statements of her safety inspector, who substantially influenced the company's decision to fire her. We also conclude that Hill has proffered sufficient evidence to create a genuine issue of material fact about whether certain reports by her inspector—reports that led to her reprimands and discharge—were issued in retaliation for her discrimination complaints against the inspector. We therefore reverse the summary judgment entered in

1. The parties agreed in district court "that the legal analysis applied to the federal questions [on summary judgment] will control this case under New York law." J.A. 301.

favor of Lockheed and remand the case for trial.

## I.

Because Ethel Hill was the nonmovant in the summary judgment proceedings, we state the facts in the light most favorable to her, drawing all justifiable inferences in her favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When Lockheed fired Hill in May 1998, she was almost fifty-eight years old and had worked for Lockheed as a sheet metal mechanic for over eleven years. Hill is a high school graduate who received additional training at technical schools in the areas of airframe construction and the x-raying of aircraft. Hill Dep. at 9–10. When Lockheed hired Hill in April 1987, she had over thirteen years of experience as a sheet metal mechanic in the aircraft industry. Hill Dep. at 13–19. During her eleven years with Lockheed, Hill was assigned to contract field teams that were responsible for working on government jobs. J.A. 61. These field teams traveled to various military bases to perform modification work on military aircraft. J.A. 62, 64–65. Over the years, Lockheed assigned Hill to work at a number of military bases, including ones at Savannah, Georgia (Hunter Army Airfield); Indiantown Gap, Pennsylvania; Fort Bragg, North Carolina; Fort Eustis, Virginia; and Fort Drum, New York. She also worked at National Guard installations in New Jersey and Puerto Rico. J.A. 230. Most of the jobs lasted for less than six months, and Hill was assigned to some of these bases several times. J.A. 230–31. Hill traveled so much for Lockheed that she eventually bought a recreational vehicle, using it as her home while she was on job assignments. Id.

Hill's last job for Lockheed was at Fort Drum, New York, beginning in January 1998 and ending in May 1998 when she was fired. Hill performed her work on this assignment without incident for about a month, but trouble began when a man named Edward Fultz was designated as her safety inspector sometime in February 1998. Hill had worked under Fultz on a Fort Drum job just three years earlier. On the earlier job Hill overheard Fultz say that he did not like to have women working under him. J.A. 234. And during the three months in 1998 when Fultz was her inspector at Fort Drum, Fultz made many derogatory comments about Hill's sex and age. On several occasions Fultz referred to her as a "useless old lady." J.A. 240A. One time he said that Hill was a useless old lady and that she needed to go home and retire. J.A. 240B. Another time Fultz said that Hill was "useless and they need[ed] to retire her." Id. He also called her a "damn woman," J.A. 241A, and "a troubled old lady," J.A. 245. Fultz was responsible for disciplinary action against Hill that led directly to her dismissal by Lockheed.

Lockheed contends that it fired Hill under its Standard Operating Procedure (SOP). The SOP allows for, but does not require, termination when an employee receives three written reprimands within one year and at least one of the reprimands involves a suspension. Hill received a written reprimand in September 1997, another with a three-day suspension in April 1998, and a third in May 1998. Hill was fired after the third reprimand. She contends that she was fired because of her sex and age and that she was also reprimanded and discharged in retaliation for making complaints to her supervisor, Richard Dixon, about Fultz's discriminatory conduct.

Hill does not challenge her first written reprimand, which she received in September 1997 while working on a job at Fort Bragg, North Carolina. She does take

issue with the second and third ones, which were issued at Fort Drum in 1998. Sometime before her second written reprimand (the first one at Fort Drum), Hill made the first of several verbal complaints to Dixon about Fultz. J.A. 242–43. When Hill specifically mentioned Fultz's sex and age discrimination during her second complaint, Dixon told her he did not want to hear about it and that she should ignore Fultz and go back to work. J.A. 242–43. Discrimination complaints at Lockheed are supposed to be investigated because the company's SOP prohibits an employee from discriminating against or harassing fellow employees. J.A. 112, 195. The first violation of the anti-discrimination policy results in a written reprimand, the second a three-day suspension, and the third subjects the violator to termination. J.A. 112. Hill's discrimination complaints were not investigated, apparently because Dixon claims that Hill did not mention discrimination, but only complained that Fultz was yelling at her and picking on her.

In any case, Hill received her second written reprimand (and the resulting three-day suspension) on April 22, 1998, after she had complained to Dixon about Fultz. This second disciplinary action against Hill was based on a misplaced pair of four-inch diagonal cutters. Under Lockheed's tool control policy, an employee must account for her tools at all times and must report missing tools to her immediate supervisor. Hill had three pairs of identical four-inch cutters, and an Army employee found a pair of Hill's cutters on a maintenance stand on April 14, 1998. J.A. 125. The Army employee took the cutters to Fultz, who then gave them to Dixon. J.A. 249A–50. Later that same day, Fultz reported something to Dixon that (according to Hill) was untrue, and this led Dixon to believe that Hill was lying about the misplaced cutters. Fultz told Dixon that he checked Hill's toolbox at the end of her

shift and asked her where her extra cutters were. According to Fultz, Hill replied, "I told Richard [Dixon] I took [them] home." J.A. 125, 250 51. Hill, however, asserts that she did not have any such encounter or exchange with Fultz. J.A. 261. Dixon, who had only Fultz's report, believed that Hill had lied to Fultz because she had not said anything to Dixon about her cutters. J.A. 250. Fultz's report also made Dixon think that Hill was less than forthcoming the next morning when he showed her the misplaced cutters and asked if they were hers. Believing that all of her cutters were accounted for, Hill simply acknowledged that the cutters had her number on them. J.A. 77–78. Because Fultz had not questioned her about missing cutters, she was blindsided by Dixon's question. Specifically, when Dixon asked her about the cutters, she was not aware that her third pair had been mislaid at the jobsite. J.A. 77. In sum, Fultz's report to Dixon, which was untrue according to Hill's evidence, led Dixon to believe that Hill had lied about the misplaced cutters. This belief prompted Dixon to give Hill a written reprimand and a three-day suspension. Dixon admits that he took this disciplinary action against Hill only because he thought she had lied about the cutters. J.A. 251A, 253.

After Hill returned from her three-day suspension at the end of April 1998, she complained again to Dixon that Fultz was discriminating against her. Dixon then talked to Fultz about Hill's complaints, J.A. 246A–46B, and Fultz reacted with noticeable anger towards Hill, J.A. 245. Immediately, Fultz began writing a series of discrepancy reports on Hill, issuing at least one every workday. These discrepancy reports, known as "201s," document worker error, classifying it as minor, major, or critical. Fultz wrote up Hill twice on Thursday, April 30, 1998, three times

on Friday, May 1, 1998, and once on Monday, May 4, 1998. Fultz himself marked each of Hill's errors as "minor," and Hill said they were "nit-picky and trivial." J.A. 83. The discrepancy reports were for matters such as failure to burnish low voltage power supply mounting holes and using the wrong screws in an antenna fairing assembly. J.A. 127. (With respect to the screws, Hill contends that she was instructed to use the only long screws left in the supply kit. J.A. 83–84.) Dixon, the supervisor, had no control over whether a discrepancy report was written. Dixon Dep. at 29–30. Dixon could, however, check a report for accuracy, and he refused to endorse one of the reports that Fultz issued against Hill. Hill Dep. at 110, J.A. 130.

The flurry of discrepancy reports that Fultz issued against Hill triggered her third written reprimand on May 4, 1998. J.A. 127. With three reprimands, Hill was now subject to discharge, and she was sent home to await word. J.A. 84. She was fired within the next few days. J.A. 239, 278. The Lockheed officials who made the formal decision to fire Hill were Archie Griffin, the east coast senior site representative, and Thomas Prickett, the program manager in charge of contract field teams. (Neither Griffin nor Prickett was located at Fort Drum; Griffin was in Georgia, and Prickett was in Texas.) According to Griffin, the decision to fire Hill was based entirely on information provided by Fultz and Dixon, especially Fultz. J.A. 256. Griffin talked with Fultz about Hill several times prior to the termination decision, and Fultz provided Griffin with a written statement of his observations about Hill's work performance. J.A. 255–56. Griffin did not talk with Hill while she was being considered for termination, nor did he ever examine her work. J.A. 256–57. Prickett, who also did not talk with Hill or have any firsthand knowledge, said that the decision

to fire Hill was "based entirely on information . . . gathered from people that work[ed] at the [Fort Drum] site." J.A. 260. Finally, Fultz wrote and signed Hill's termination statement, which explains that Hill was fired because Fultz found her work to be unsatisfactory. J.A. 170–72. When Hill was fired, she was the only woman and the oldest employee on her eight-person work team. J.A. 279. Hill's work was initially assigned to a thirty-one-year-old man, and she was ultimately replaced by a man who was forty-seven.

In June 1998 Hill filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission, and the EEOC issued her a right-to-sue letter dated April 19, 1999. Hill then filed a complaint in the United States District Court for the District of South Carolina alleging that she had been wrongfully discharged because of her sex and age in violation of Title VII, the ADEA, and the New York Human Rights Law. Hill also alleges that she was terminated in retaliation for complaining about the discriminatory behavior of Fultz, her inspector. Lockheed moved for summary judgment, and the district court granted the company's motion. First, the court held that Hill did not proffer any direct evidence of discrimination. Fultz's many derogatory comments about Hill's sex and age do not count, the court said, because Fultz did not make the final decision to fire Hill. Second, the district court concluded that Hill did not proffer sufficient circumstantial evidence to withstand summary judgment on the discrimination claims. Finally, with respect to the retaliation claim, the district court concluded that Hill had established a prima facie case, but the claim failed because Hill could not show that Lockheed's claim of poor job performance was pretext for a retaliatory discharge. Hill appeals.

## II.

We turn first to the question of whether the district court properly granted summary judgment to Lockheed on Hill's sex and age discrimination claims. Section 703 of Title VII makes it "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). The ADEA contains a parallel prohibition: "It shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

There are two methods for proving intentional sex or age discrimination in the employment setting. *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606–07 (4th Cir.1999). Specifically, "[i]ntentional discrimination in employment cases fall within one of two categories: 'pretext' cases and 'mixed-motive' cases. The distinction is critical, because plaintiffs enjoy more favorable standards of liability in mixed-motive cases, and this is even more so after the Civil Rights Act of 1991." *Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir.1995) (internal quotations and citations omitted).

The more commonly used method of proving discrimination is by the use of circumstantial evidence under the three-step, or burden shifting, "pretext" method laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework the plaintiff-employee must first prove a prima facie case of discrimination in her employment. If she succeeds, the defendant-employer must respond with evidence showing that it had a legitimate, nondiscriminatory reason for the adverse employment action. At that point, the burden shifts back to the plaintiff to prove that the employer's proffered reason was a pretext for discrimination. The plaintiff retains the ultimate burden of persuading the factfinder that she was the victim of discrimination. *See Brinkley*, 180 F.3d at 607.

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which recognized that an employment decision may be motivated by both legitimate and illegitimate considerations, established the framework for the second, or "mixed-motive," method of proving employment discrimination. The plaintiff's initial burden is heavier under the *Price Waterhouse* framework. Instead of starting with the *McDonnell Douglas* prima facie case, which relies on circumstantial evidence to set up a presumption of discrimination, the plaintiff proceeding under *Price Waterhouse* must offer evidence of discrimination that is more direct. If the plaintiff crosses this evidentiary threshold, both the burden of production and "the burden of persuasion shift[ ] to the employer to prove that it would have reached the same determination [even if it had been] without any discriminatory animus." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (en banc) (internal quotations and citations omitted). Once the burden of persuasion shifts to the employer under Price Waterhouse, the employer may escape liability only if it proves that it would have made the same employment decision based on purely legitimate reasons. " '[A]n employer may not meet its burden in such a case by merely showing that at the time of the decision it was

motivated only in part by a legitimate reason. The very premise of a mixed-motive case is that a legitimate reason was present.... The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.'" *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1236 (4th Cir.1995) (quoting *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. 1775).

Section 107(a) of the Civil Rights Act of 1991 modified the *Price Waterhouse* framework, "making mixed-motive treatment more favorable to plaintiffs." *Fuller*, 67 F.3d at 1142. The 1991 Act provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). "The bonus for [Title VII] plaintiffs able to invoke the standard applicable in mixed-motive cases [after the 1991 Act] is that the proof by the employer that it would have reached the same determination without any discriminatory animus does not allow the employer to avoid liability altogether. Rather, such proof only limits the remedies available to the plaintiff." *Taylor*, 193 F.3d at 232. In other words, Congress decided that an employer breaks the law if an illegitimate criterion was a "motivating factor" in the employment decision, even if the employer would have made the same decision based solely on legitimate factors. "[E]mployers now violate [Title VII] when

[a forbidden factor] plays an actual role in an employment decision, regardless of other considerations that may independently explain the outcome." *Fuller*, 67 F.3d at 1142. *See also Pilditch v. Bd. of Educ.*, 3 F.3d 1113, 1118 n. 2 (7th Cir.1993) ("[T]he Civil Rights Act of 1991 overrules *Price Waterhouse* ... and makes an employment decision illegal if it was motivated at all by an illegitimate motive.").[2]

█ A plaintiff claiming sex or age discrimination need not rely on the *McDonnell Douglas* pretext method of proof if she is eligible to use the alternative *Price Waterhouse* mixed-motive method. As the Supreme Court recently repeated, "*McDonnell Douglas* ... is inapplicable where the plaintiff presents direct evidence of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (internal quotations omitted). See also *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1434 (4th Cir. 1985) ("[D]irect evidence of age [or sex] discrimination obviated the need for an independent showing by plaintiffs that [the employer's] articulated reasons for their discharges were 'pretextual.' ").

### A.

█ The first question before us, then, is whether Hill has proffered evidence of sex and age discrimination that is sufficiently direct to enable her to use the mixed-motive method of proof. "A plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if [she] presents 'direct evi-

---

**2.** Our circuit has not decided whether section 107(a) of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m), applies to ADEA mixed-motive cases. The issue was not addressed by the district court, and the parties have not briefed it for us. We therefore assume without deciding that § 2000e-2(m) does not apply to the ADEA and that the original Price Waterhouse framework is still controlling for

ADEA claims. Thus, we assume that a defendant-employer in a mixed-motive case under the ADEA may escape liability if it shows it would have made the same decision based solely on legitimate factors. If it becomes necessary on remand, the district court can consider whether § 2000e-2(m) governs ADEA mixed-motive claims.

dence that decisionmakers placed substantial negative reliance on an illegitimate criterion.'" *Taylor,* 193 F.3d at 232 (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)). Justice O'Connor, whose *Price Waterhouse* concurrence is controlling in this circuit, *see id.,* did not specify what constitutes direct evidence. She did, however, list what does not: "stray remarks in the workplace, ... statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring). Our court understands *Price Waterhouse* to mean that the direct evidence threshold is met with "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor,* 193 F.3d at 232. In other words, Hill "must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." *Brinkley,* 180 F.3d at 608.[3]

1.

▮▮▮ Derogatory remarks may constitute direct evidence of a discriminatory

attitude in the workplace. *See Brinkley,* 180 F.3d at 608. Fultz, the man responsible for inspecting Hill's work at Fort Drum, regularly made derogatory comments about her age and sex. Several times Fultz referred to Hill as a "useless old lady." J.A. 240A. Once Fultz said that Hill was a useless old lady and that she needed to go home and retire. J.A. 240B. On another occasion Fultz said that Hill was "useless and they need to retire her." J.A. 240B. Fultz also called Hill "a troubled old lady," J.A. 245, and a "damn woman," J.A. 241A. Fultz's statements, which were all directed at Hill while she was on the job, clearly demonstrate that Fultz had a discriminatory attitude towards Hill at the workplace.

We note parenthetically that Fultz's comments cannot be characterized as ambiguous or open to alternate interpretation. They are therefore distinguishable from other comments about age and sex that we have rejected as direct evidence of a discriminatory attitude. For example, Fultz's comments were not humorous, jocular, or general "commentary on the fact that all people age." *O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 549–50 (4th Cir.1995), *rev'd on other grounds,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Nor can Fultz's state-

---

**3.** In this opinion we use the term "direct evidence" to refer to evidence, be it direct or indirect, that is of sufficient strength to warrant use of the mixed-motive framework. As our court has said, "whether a case is a pretext or mixed-motive case ultimately hinges on the strength of the evidence establishing discrimination." *Fuller,* 67 F.3d at 1143 (footnote omitted). To meet the mixed motive evidentiary threshold in this circuit,

> an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992). To overcome a summary judgment motion based upon this method of proof, the plaintiff

"must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co., Inc.,* 836 F.2d 845, 848 (4th Cir.1988). "What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision. *Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995). If such evidence is lacking, the plaintiff may nevertheless proceed under *McDonnell Douglas.*

*Brinkley,* 180 F.3d at 607 (alteration in original).

ments be discounted because they are not sufficiently connected to Hill. *See Taylor,* 193 F.3d at 232. Fultz said plenty that was specifically directed at Hill. In short, his statements describing Hill as a useless old lady who needed to go home and retire directly reflect a discriminatory attitude towards Hill.

### 2.

Hill must also proffer evidence that clearly shows a nexus between Fultz's discriminatory attitude and the contested employment decision. In other words, Hill must establish that Fultz's negative attitude about her sex and age bore directly on her termination. The district court concluded that Hill could not make this showing because Fultz did not have the authority to fire her. Instead, the final decision to terminate her was made by Griffin and Prickett. In her *Price Waterhouse* concurrence, Justice O'Connor distinguishes between "decisionmakers" and "nondecisionmakers," noting that comments by the latter cannot constitute direct evidence of discrimination. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring). Lockheed urges us to adopt the district court's narrow concept of "decisionmaker," which would limit a decisionmaker to someone with the power to make the final decision with respect to terms of employment. We reject this approach because by limiting direct evidence of discrimination to the statements and actions of *formal* decisionmakers, it overlooks discrimination by subordinates who are actual decisionmakers, that is, subordinates who lack formal authority but who nevertheless exercise substantial influence in employment decisions.

### a.

■ In deciding whether a subordinate is a decisionmaker in a *Price Waterhouse*

mixed-motive case, the focus must be on the subordinate's actual influence rather than his formal role in the adverse employment decision. The reason for this is simple: if a biased subordinate has substantial influence over the employment decision, the subordinate's bias can bear directly on the decision. If we refused to recognize this, it would mean that the statement, "I'm going to get you fired because you are old and female," made by a subordinate who was an actual (but not a formal) decisionmaker could not count as direct evidence of discrimination. That cannot be right, for if it was, a wily employer could prevent a plaintiff from ever taking advantage of the *Price Waterhouse* framework. The employer could create a position of manager in charge of firing, and that manager could make formal firing decisions based solely on the recommendations of subordinates with no official authority. Because the manager would not conduct independent investigations, the subordinate would be making the actual firing decisions. Yet the employer would not be subject to the plaintiff-friendly standard of *Price Waterhouse* even if the subordinate clearly recommended a discharge based on his expressed bias toward the targeted employee. It should not be so easy to eliminate the *Price Waterhouse* option for proving violations of Title VII and the ADEA. *Cf. Wells v. New Cherokee Corp.,* 58 F.3d 233, 238 (6th Cir.1995) (making similar points in a pretext case).

At least five circuits hold that a plaintiff may establish direct evidence of employment discrimination through the statements or conduct of a person who lacks formal authority to hire or fire but who nonetheless influences an employment decision.[4] *See Ostrowski v. Atlantic Mut.*

---

4. Although our circuit has not expressly held

that evidence of discriminatory conduct by a

*Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992) (a *Price Waterhouse* mixed-motive instruction must be given "if the plaintiff presents evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude"); *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir.2001) (the discriminatory comments of plaintiff's supervisor, who did not have formal firing authority but who "had enormous influence in the decisionmaking process," constituted direct evidence); *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 514–15 (3d Cir.1997) (a person is in the decisionmaking process for *Price Waterhouse* purposes when he has direct access to the formal decisionmaker and his discriminatory animus is "linked to [the formal decisionmaker's] specific decision to fire the plaintiffs"); *Simpson v. Diversitech Gen., Inc.*, 945 F.2d 156, 160 (6th Cir.1991) (the plaintiff met his burden under *Price Waterhouse* by proving that his supervisor's racial bias "led substantially to [his] dismissal, [and] the fact that [the supervisor] did not 'pull the trigger' is of little consequence"); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir.1994) (the discriminatory remarks of a manager, who was the fired plaintiff's supervisor and who was "closely involved in the decision-making process," constituted direct evidence under *Price Waterhouse* ); *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir.2001) (a manager's comment was direct evidence of retaliation because "[e]ven if the manager was not the ultimate decisionmaker [in denying the plaintiff a promotion], that manager's motive may be imputed to the company if the manager was involved in the ... decision").[5]

subordinate who substantially influences the formal decisionmaker may count as direct evidence in the mixed-motive context, our decision in *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429 (4th Cir.1985), is consistent with that approach. In *Wilhelm* three plaintiffs charged that their employer had fired them because of their age, and the plaintiffs relied in part on the comments of their immediate supervisor. When placing one of the plaintiffs on probation, the supervisor said that "older people tend to become complacent whereas younger people have more drive and ambition." *Id.* at 1433. The supervisor added that "[h]e was going to take care of [the targeted employee] first and then there were going to be some others." *Id.* at 1433–34. We never characterized the supervisor as a final decisionmaker. In fact, the supervisor was no longer managing at least one plaintiff at the time of that plaintiff's discharge. Nevertheless, we considered the supervisor's earlier comments to be direct evidence of age discrimination.

5. Although the remaining circuits have not expressly held that direct evidence of discrimination can come from the statements of a person who influences, but does not formally make, the adverse employment decision, several may be heading in that direction. *See, e.g., Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121–22 (7th Cir.1998) ("Normally the plaintiff must prove that the decisionmaker uttered the remarks" to be entitled to Price Waterhouse mixed motive instructions, yet "if a plaintiff can show that the attitudes of the person who made the remarks tainted the decisionmaker's judgment, the remarks can be relevant to prove discrimination."); *Trotter v. Bd. of Trs. of Univ. of Alabama*, 91 F.3d 1449, 1453–54 (11th Cir.1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision."); *Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 204 (D.C.Cir.1998) (internal quotations and citation omitted) (Price Waterhouse "burden shifting requires evidence of conduct or statements by persons involved in the decisionmaking process").

The Fifth and Tenth Circuits have never reached the question of whether the discrimination of someone who influences an employment decision is admissible as direct evidence in a mixed-motive case. This is probably because these circuits have a very strict view

Because pretext cases are much more common than mixed-motive cases, courts have had more opportunity in pretext cases to explore the relevance of evidence showing the discriminatory attitude of a person who lacks formal authority to hire and fire but who nonetheless influences the employment decision. We recognize, of course, that pretext cases do not require direct evidence of discrimination. Yet the question of who counts as a relevant decisionmaker is the same in both pretext cases and mixed-motive cases. Specifically, in determining whether discrimination actually motivated an employment decision, do you focus on the attitude of the formal decisionmaker only, or may you also consider the attitude of a person who influenced the formal decisionmaker? Again, this is not a question about the type of evidence used, which differs in mixed-motive and pretext cases. Rather, this is a question about whose discrimination counts in determining if discrimination motivated the adverse employment decision, regardless of the type of evidence used to prove the discrimination. Because the same question must be answered in both pretext and mixed motive cases—whether discrimination motivated the adverse employment decision—the answer to the question of whose discrimination counts should be the same in both cases. That is, the answer to the question of who qualifies as a decisionmaker should be the same. In pretext cases our court and most other courts of appeals have rejected the view that the only relevant decisionmakers are those with final or formal authority. These pretext cases support the proposition that the discriminatory attitude of someone who is an actual, but not a formal, decisionmaker may prove that discrimination motivated the employment decision.

The focus on a person's actual influence on a decision rather than his formal authority is consistent with the Supreme Court's approach in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151–53, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), an ADEA pretext case. The plaintiff in Reeves claimed that he was terminated because of his age, and as evidence of pretext he offered the derogatory remarks of his supervisor who had recommended his dismissal to the company president. The supervisor had made comments such as "[the plaintiff] was so old [he] must have come over on the Mayflower." *Id.* at 151, 120 S.Ct. 2097 (second alteration in original). Because the supervisor was not the formal decisionmaker, the appeals court had discounted these comments because they were "not made in the direct context of [the plaintiff's] termination." *Id.* at 152, 120 S.Ct. 2097. The Supreme Court rejected this analysis. Instead, it examined the supervisor's actual role in the termination decision and concluded that the plaintiff had "introduced evidence that [the supervisor] was the actual decisionmaker behind his firing." *Id.* The Court concluded that the supervisor's comments helped establish pretext be-

---

of what qualifies as direct evidence in a mixed-motive case. In the Tenth Circuit, for example, a comment by a formal decisionmaker that the plaintiff was an "incompetent n_____ [racial slur]" was not direct evidence because the factfinder "would have to infer that the bias reflected in the statement[ ] was the reason behind the adverse employment decision." *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir.1999). The Fifth Circuit has taken a similarly strict view of direct evidence. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1218 (5th Cir.1995). *But see Brown v. East Mississippi Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993) (holding that a supervisor's "routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions"). As we have explained earlier, see supra note 3, the Fourth Circuit does not take such a restrictive approach.

cause they showed that the supervisor "was motivated by age-based animus and was principally responsible for [the plaintiff's] firing." *Id.* at 151.

In one of our own ADEA pretext cases, *Tuck v. Henkel Corp.*, 973 F.2d 371 (4th Cir.1992), we expressly rejected "the proposition that a fired employee cannot rely on demonstrating the prejudice of a supervisor who is not the ultimate decisionmaker to prove that discrimination motivated the employer's termination decision." *Id.* at 377 n. 6. Instead, we said that the relevant question is whether the supervisor had actually influenced the decision to fire the plaintiff. In reversing a summary judgment for the employer, we noted that the plaintiff had "present[ed] some probative evidence that [his] former supervisor . . . was biased against older workers and that [the supervisor] influenced the decision to fire [him]." *Id.* at 376–77. As a result, we held that whether the supervisor had actually influenced the decisionmakers was "an open [factual] question" that

would have to be decided by a jury. *Id.* at 377.

Most appeals courts have adopted a similar approach in their pretext cases and have held that the ultimate decisionmaker's lack of bias cannot shield the employer from liability if the employment decision was tainted by the bias of a subordinate.[6] The courts differ only in how much influence they require of the subordinate who lacks formal authority before his discrimination is imputed to the employer. Some circuits require that the formal decisionmaker rely entirely on the biased subordinate, so that the employer is not liable, for example, if the formal decisionmaker conducts an independent investigation. *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 405–06 (7th Cir.1990) (When a committee has "acted as a conduit of [a supervisor's] prejudice—his cat's paw—the innocence of its members would not spare the company from liability").[7] Other circuits require only that the

---

**6.** A number of courts and our dissenting colleague, Judge Traxler, use the terms "cat's paw" and "rubber stamp" to characterize their standards for deciding when a subordinate's bias can be used to prove a discriminatory employment decision. *See post* at 684; *see also* Rebecca Hanner White & Linda Hamilton Krieger, Whose Motive Matters?: Discrimination in Multi–Actor Employment Decision Making, 61 La. L.Rev. 495, 511–12 (2001). While the two terms are clever and often useful, we do not include them in our formal holding. *Infra* at 670–71. When the terms are confined to their literal meanings, they characterize very limited circumstances. The term "cat's paw" means "dupe" or "tool" and originates from a fable in which a monkey duped a cat into using its paw to pull roasting chestnuts from a fire. *See* Webster's Third New International Dictionary 354 (1993). Taken literally, "cat's paw" would cover only the situation when a biased subordinate dupes a formal decisionmaker into taking adverse action against another employee. Similarly, "rubber stamp" means "to approve endorse, or dispose of (as a document or

policy) as a matter of routine usually without the exercise of judgment or at the expressed or implied command of another person or body." *Id.* at 1983. Taken literally, "rubber stamp" would apply only to the situation when the formal decisionmaker automatically endorses the biased subordinate's recommendation without exercising independent judgment. Nonetheless, as the cases we will mention illustrate, some courts that adopt what they call a "cat's paw" or "rubber stamp" standard go beyond the literal meaning of the terms in applying the standard.

**7.** *See also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000) ("[A] defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent."); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir.1998) ("In a cat's paw situation, the [person with the discriminatory animus] clearly causes the tangible employment action, regardless of which indi-

biased subordinate play some role in the decision. *See, e.g., Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir.2001) (internal quotations and citation omitted) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate ... [because] an evaluation at any level, if based on discrimination, [may] influence[ ] the decision-making process and thus allow[ ] discrimination to infect the ultimate decision.").[8] A few circuits have not yet worked out the precise standard for the degree of influence required on the part of the subordinate, but as a general proposition they accept as evidence of pretext the discriminatory comments of a subordinate who influences, but who does not make, the final employment decision. *Compare Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir.2000) ("If the [plaintiff] can demonstrate that others had influence or leverage over the official decisionmaker ... it is proper to impute their discriminatory attitudes to the formal decisionmaker."), *with Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir.2001) ("[T]o prevent employers from insulating themselves from acts of subordinates ... when the ultimate decisionmaker's action is merely a 'rubber stamp' for the subor-

dinate's recommendation ... the forbidden motive of a subordinate employee can be imputed to the employer.").[9]

■ Like the mixed-motive cases cited earlier, the pretext cases demonstrate that in addressing the question of whose discriminatory animus counts as evidence of discrimination in an employment decision, the courts generally agree on two points. First, in evaluating whether a person is a decisionmaker, what matters is his actual role rather than his formal role in the adverse employment decision. Second, an employer should not be able to insulate itself from liability by hiding behind a formal decisionmaker. These points lead us to conclude that a biased subordinate who does not make the final or formal employment decision may still count as a decisionmaker in a Price Waterhouse mixed-motive case. In short, we hold that a subordinate is a decisionmaker for Price Waterhouse purposes if he has a substantial influence on the employment decision. Consequently, evidence of the subordinate's discriminatory animus may constitute direct evidence in a mixed-motive case.

### b.

We pause here to acknowledge that our standard for deciding when a subordinate

---

vidual actually signs the employee's walking papers.").

**8.** *See also Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C.Cir.1998) ("Thus do we join at least four other circuits in holding that evidence of a subordinate's bias is relevant where the ultimate decisionmaker is not insulated from the subordinate's influence."); *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000) ("One method [of proving pretext] is to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker."); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir.1998) ("[R]emarks

by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, were relevant.").

**9.** *See also Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1057 (8th Cir.1993) (" '[A]n employer cannot escape responsibility for wilful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of older workers.' " (quoting *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir.1993))).

counts as a decisionmaker is based on the same principles that Judge Traxler articulates so well in his dissent. We agree with him that "an employer should not be allowed to insulate itself from liability [for discrimination] by hiding behind ... formal decisionmakers," post at 684, and that we need an "appropriate means to prevent employers from unfairly insulating themselves from the consequences of adverse employment actions that are in reality based upon the discriminatory motives of a subordinate employee," *id.* Our disagreement, insofar as the standard is concerned, is about the degree of influence that a subordinate must have on the employment decision before his discrimination counts. Judge Traxler reads Reeves to mean that if the subordinate is not the "actual decisionmaker" behind the employment action, he must be at least "principally responsible" for the action before liability attaches to the employer. *See post* at 682–83, 686. We respectfully suggest that Reeves should not be read so narrowly. In Reeves the Supreme Court simply determined that the facts permitted the jury to find that the biased subordinate was "principally responsible for [the plaintiff's] firing." *Reeves,* 530 U.S. at 151, 120 S.Ct. 2097. The Court did not say that a subordinate's involvement in the employment decision must rise to the level of "principal responsibility" before the subordinate's discrimination can be imputed to the employer. Reeves does not articulate a standard for identifying a decisionmaker, and nothing in Reeves suggests that the subordinate who substantially influences an employment decision cannot qualify as a decisionmaker. Reeves in fact focuses on the subordinate's influence, even pointing out

that the subordinate was married to the formal decisionmaker, the company president. *Id.* at 152, 120 S.Ct. 2097; *cf. Russell,* 235 F.3d at 227 (noting the case's factual similarity to Reeves and concluding that "it is appropriate to tag the employer with an employee's age-based animus if the evidence indicates that the worker possessed leverage, or exerted influence, over the titular decisionmaker").

The biased subordinate must have a substantial influence on the employment decision because we agree with Judge Traxler that employers must not be "unfairly tagg[ed] ... with the discriminatory motives of subordinate employees who have not been entrusted with formal decision-making authority." Post at 684 (emphasis added).[10] Accordingly, under the standard we adopt today, a subordinate lacks substantial influence over the final employment decision when the formal decisionmaker conducts an independent investigation and exercises independent judgment that is free of discrimination. See infra at 673 n. 11.

### c.

In this case Hill has proffered considerable evidence to show that Fultz is an actual decisionmaker because he had a substantial influence on Lockheed's decision to fire her. The two formal decisionmakers—Griffin who was in Georgia and Prickett who was in Texas—did not conduct an independent investigation of Hill. Nor did they exercise independent judgment in reaching the termination decision. They never observed Hill's work or questioned her about the events leading to her reprimands. Instead, they relied entirely on

---

**10.** We do not mean to quibble, but we are uncomfortable with the dissent's characterization of our standard. *See post* at 684 (stating that under our holding "a biased subordinate ... may count as a decisionmaker ... simply because he has had a 'substantial influence' on the process which led to the employment decision") (emphasis added). Our standard focuses on the subordinate's influence on the decision, not on the process.

information provided by Fultz and Dixon, especially Fultz. The extent of Dixon's influence is unclear. Prickett does not remember any conversations with Dixon, and Dixon does not tell a consistent story about his conversations with Griffin. At one point in his deposition, Dixon said he told Griffin that he did not think Hill could do the job anymore. J.A. 150. At another point, however, Dixon testified that he submitted Hill's file without any recommendation about discharge. J.A. 147. According to Dixon, when Griffin asked him for a recommendation, Dixon said, "that's up to you." *Id.* When the facts are taken in the light most favorable to Hill, Dixon's role was limited to the two reprimands he issued. But these reprimands, which led to Hill's termination, were based on information (some of it false, according to Hill) provided by Fultz.

Griffin acknowledges that in making the decision to terminate Hill, he received Fultz's discrepancy reports on Hill and the written reprimands. He also received a written statement from Fultz that detailed Fultz's observations about Hill's work performance. J.A. 256. Finally, he talked with Fultz several times about Hill. J.A. 255. Prickett also talked with Fultz, according to Dixon and Lockheed human resources representative, Donald Smith. Smith Dep. at 10. (Prickett said that he was responsible for over 700 employees, Prickett Dep. at 8, and he could not recall whom he consulted about Hill, J.A. 181.)

Fultz claims that he did not talk with Griffin or Prickett about Hill's termination. That claim, of course, is directly contradicted by Griffin and Dixon, who acknowledge that Fultz was involved. Indeed, it was Fultz who ultimately wrote Hill's termination statement, a statement that listed the reasons why Hill was fired. J.A. 170–72. Every reason listed was based on Fultz's dissatisfaction with Hill's work.

Fultz began with the missing tool incident and ended with a discussion of the discrepancy reports he issued during Hill's last three days of work, after she had complained to Dixon that Fultz was discriminating against her. All of this demonstrates that Hill has proffered sufficient evidence to show that Fultz had a substantial influence on the decision to fire her and that Griffin and Prickett, the formal decisionmakers, were essentially rubber stamps for Fultz, the man on the scene at Fort Drum.

The initial thrust of the dissent's argument is that Fultz cannot be deemed a decisionmaker for the following reason: the second and third reprimands (which led to Hill's dismissal) were cleansed of Fultz's bias because Dixon, the supervisor, reviewed the facts and decided independently to issue the reprimands. The summary judgment record does not permit this conclusion. But even if it did, Lockheed still has a problem because the facts, taken in the light most favorable to Hill, establish that Dixon's review did not cleanse the ultimate firing decision of discrimination. When it came time to consider termination, Griffin and Prickett, the formal decisionmakers, turned primarily to Fultz for information and evaluation. Griffin and Prickett did not exercise independent judgment. As we have already discussed, they even relied on Fultz to write Hill's termination statement. The three-page statement begins by noting that it lists "all actions, problems, or rule violations that resulted in [Hill] being terminated." J.A. 170. The substance that follows is based solely on Fultz's observations and his evaluation of Hill's performance. And Fultz—not Griffin or Prickett—signed the termination statement. It would thus be reasonable to find that Fultz had a substantial influence on the decision to terminate Hill. Indeed, it would be reasonable to find under the dissent's stan-

dard that Fultz was "principally responsible" for Hill's termination.[11]

#### d.

■ We concluded in part II.A.1, supra, that Fultz's comments about Hill's sex and age "clearly indicate[ ] a discriminatory attitude [towards Hill] at the workplace." *Brinkley,* 180 F.3d at 608. There must, of course, be "a nexus between [Fultz's] negative attitude and the employment action" taken against Hill. *Id.* Fultz's statements that Hill was a damn woman and a useless old lady who should be retired bear directly on the contested decision for several reasons. As we have just explained, the statements were made by an actual decisionmaker. This is a crucial factor in establishing the required nexus between the discriminatory animus and the adverse employment decision, although this alone is not enough. The content and timing of the statements are also relevant in determining whether there is a sufficient nexus. Here, Fultz's remarks disparaged Hill's professional abilities and reflected Fultz's harsh judgment that such a "useless old lady" should not be allowed to remain at Lockheed. Furthermore, these remarks were made shortly before or at the same time as · the reprimands that triggered Hill's termination. They thus reflect the decisionmaker's state of mind at the time he was taking actions that led directly to the adverse employment action. For these reasons, we conclude that Hill presented direct evidence that sex and age played a role in her termination, and she is therefore entitled to pursue a mixed-motive case.

#### B.

■ Hill has proffered direct evidence of sex and age discrimination. We must now consider how this affects Lockheed's motion for summary judgment. Because Hill has proffered direct evidence that discriminatory animus played a role in her termination, the company must be denied summary judgment on her sex discrimination claim. The essential question that remains must be resolved by a factfinder, that is, whether Hill's direct evidence of sex discrimination is credible. If the factfinder credits Hill's evidence and determines that Hill's sex played a role in her termination, then Lockheed is liable regardless of whether it would have made the same decision absent the discrimination: "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). In other words, if sex was a motivating factor in Hill's

---

**11.** Contrary to the dissent's worry, *see post* at 695, Lockheed would be entitled to summary judgment under the following hypothetical facts if they were undisputed. Hill steals from Lockheed. Fultz, because of his age- and sex-based animus towards Hill, reports her theft to Dixon. Dixon confronts Hill and she confesses to the theft. Dixon then passes word of Fultz's report and Hill's confession on to Griffin. Griffin investigates and determines that a theft occurred and that Hill confessed to the misdeed. Griffin fires Hill as a result. Lockheed would get summary judgment because it is undisputed in this hypothetical that the decision to fire Hill was based on her theft and that the decision was not influenced by Fultz's discriminatory animus. Stated another way, summary judgment would be appropriate because the hypothetical facts demonstrate that Griffin conducted an independent investigation and exercised independent judgment in terminating Hill. The actual case before us today is different. Hill has proffered evidence that Fultz's discrimination substantially influenced the decisions to issue the reprimands, the actions that led to Hill's termination. Moreover, Fultz influenced the ultimate decision to fire Hill, according to her evidence.

discharge, Lockheed is liable under Title VII. Consequently, even if Lockheed is able to prove that it would have made the same decision despite discriminatory animus, that showing would only limit the relief available to Hill under Title VII. See 42 U.S.C. § 2000e–5(g)(2)(B). It would not affect Lockheed's Title VII liability on the sex discrimination claim.

■■■ As for Hill's age discrimination claim, we assume without deciding that section 107(a) of the Civil Rights Act of 1991 did not change the law for proving mixed-motive cases under the ADEA. See supra note 2. Thus, we assume that the original Price Waterhouse framework applies to Hill's age discrimination claim. Under this framework, once the plaintiff provides direct evidence of discrimination, the burden of persuasion shifts to the employer to prove that legitimate factors alone would have led it to make the same adverse employment decision, and the employer avoids liability only if it is successful in making this showing. Thus, with respect to Hill's age discrimination claim, we must decide whether Lockheed is entitled to summary judgment on its defense that legitimate factors alone would have led it to fire Hill, notwithstanding Fultz's age discrimination. "[O]nce the plaintiff has presented direct evidence that a forbidden factor contributed to the employer's decision to take adverse action against her, a trial will normally be necessary in order to determine whether the employer would have taken the same action in the absence of the illicit consideration." *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 615 n. 12 (7th Cir. 1998). *See also Adler v. Madigan*, 939 F.2d 476, 479 (7th Cir.1991) (observing that mixed-motive cases "are ordinarily not grist for the summary judgment mill"). In other words, once a plaintiff proffers direct evidence that discrimination figured

into the adverse employment decision, that evidence normally creates a material factual issue about the validity of the employer's defense that it would have made the same decision regardless of the discrimination. This is not to say, however, that an employer can never obtain summary judgment on its same-decision defense in a mixed-motive case. But the employer will be entitled to summary judgment only if it proffers evidence that is so one-sided that a rational factfinder could only conclude that the employer must prevail on its same-decision defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–52, 106 S.Ct. 2505; *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 854 (4th Cir.2001). The proffered evidence must therefore reasonably support only one conclusion—the conclusion that the employer's legitimate reason, standing alone, would have prompted the adverse employment decision. *See Frobose*, 152 F.3d at 615 n. 12; *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir.), *cert. denied*, 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125 (2000). As we demonstrate below, the summary judgment record does not indisputably establish Lockheed's defense. There is a material question of fact about whether Lockheed would have fired Hill in the absence of Fultz's discriminatory animus.

Because Hill's termination was triggered by the second and third reprimands she received at Fort Drum, Lockheed's same-decision defense boils down to the claim that legitimate factors alone would have prompted both of those reprimands, regardless of Fultz's age discrimination. Again, Hill's second reprimand was for violating Lockheed's tool control policy, and the third was for receiving several discrepancy reports.

Lockheed argues initially that Hill cannot challenge the reprimand for the tool control violation because the company

could have fired her for this violation alone. The first problem with this argument is that Lockheed's SOP does not require termination for this offense. SOP violations that call for immediate termination include fighting, theft, unauthorized possession of weapons, sleeping on duty, falsification of records, and use of alcohol or drugs at work. J.A. 113–14. Violation of the tool control policy is not specifically listed in the SOP. This violation appears to fall under Rule 15, "Violation of written Company directives/policy." J.A. 113. Punishment for a violation of Rule 15 can range from a written reprimand, to a three-day suspension, or to termination, depending on the severity of the violation. *Id.* Here, of course, Lockheed did not fire Hill when she misplaced her cutters. It reprimanded her and imposed a three-day suspension. In any event, the proper question is not whether Lockheed could have fired Hill for misplacing her tool but whether it has proffered undisputed proof that it would have disciplined her even in the absence of Fultz's discriminatory animus. See *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775 (emphasis added) ("[T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [age] into account."). Lockheed, the party that now has the burden of persuasion, has not offered any proof that it regularly fires employees for misplacing a tool. .

Lockheed next argues that Hill would have received the second reprimand even without any discrimination on Fultz's part. Under Lockheed's tool control policy, employees must be able to account for their tools at all times and must report missing tools immediately. An Army employee found a pair of Hill's four-inch cutters on a maintenance stand on April 14, 1998. J.A. 125. The Army employee gave the cutters to Fultz who, in turn, delivered them to Dixon. J.A. 249A 250. Later in the day, Fultz told Dixon that he (Fultz) checked Hill's toolbox at the end of her shift and asked her where the extra pair of cutters was. According to Fultz, Hill said "I told Richard [Dixon] that I had taken the tool home." J.A. 125, 250–51. Fultz's report— a false report, according to Hill—led Dixon to conclude that Hill had lied to Fultz because she had not said anything to Dixon about her cutters. The next morning Dixon concluded that Hill was again dishonest when he showed her the misplaced cutters and asked if they were hers. Because Hill believed that none of her cutters were missing, she said only that the cutters had her number on them. J.A. 77–78. Dixon's conclusion that Hill was less than candid was based on Fultz's report that he had already questioned Hill about the misplaced cutters. Hill, however, insists that Fultz did not talk to her about her cutters. J.A. 261. Thus, when Dixon asked her if the missing cutters were hers, she had not been alerted to the fact that any of her cutters had been misplaced. Hill was, of course, subject to discipline because of her misplaced tool. Dixon, however, says unequivocally that he would not have issued the reprimand and three-day suspension to Hill if she had not lied. J.A. 251A, 253. But Dixon thought Hill lied because of what Fultz told him. Because Hill has proffered evidence that Fultz's report to Dixon about the cutters was false, there is a genuine factual issue about whether Hill would have been disciplined (reprimanded and suspended) over the tool in the absence of Fultz's discriminatory animus. That disciplinary action was a necessary pre-requisite to Hill's dismissal.[12]

**12.** The dissent argues that Hill cannot establish that her second reprimand for the mislaid

Fultz was also heavily involved in Hill's third reprimand, which was based on several minor errors that Fultz detected in her work. As we explain in greater detail in part III, *infra*, Hill has proffered evidence that Fultz wrote her up for these errors in swift retaliation for her complaints about his discrimination. There is a genuine factual issue about whether the third reprimand would have been issued in the absence of Fultz's discrimination against Hill. The third reprimand was also a necessary prerequisite to Hill's termination.

Thus, on Lockheed's defense that it would have fired Hill even without Fultz's discriminatory animus, the company has not proffered evidence so one-sided that it must prevail at the summary judgment stage. A rational factfinder could conclude that Lockheed would not have reached the same decision, that is, the decision to fire Hill, in the absence of Fultz's discrimination. There is, in other words, a genuine issue of material fact about whether Lockheed would have issued the second and third reprimands, which triggered Hill's

dismissal, in the absence of Fultz's illegitimate motives.

## C.

To sum up, we conclude that Hill has proffered direct evidence of sex and age discrimination, thereby qualifying her to proceed under *Price Waterhouse's* mixed-motive framework for proving a case. As a result, Lockheed is not entitled to summary judgment on Hill's Title VII claim because a rational factfinder could conclude that sexual discrimination was a motivating factor in the decision to terminate her. In addition, Lockheed is not entitled to summary judgment on Hill's ADEA claim because Hill has proffered evidence of age discrimination, and Lockheed has not proffered evidence that points indisputably to the conclusion that it would have fired Hill anyway.[13]

## III.

Hill also alleges that her termination was in retaliation for her complaints to Dixon about Fultz's discrimination. Hill last complained to Dixon about Fultz when

cutters was a product of Fultz's bias for two reasons. First, the dissent faults Hill for not defending herself against Fultz's false report when Dixon confronted her about the misplaced cutters on the morning of April 16, 1998. *See post* at 687–88. The problem is this: although Dixon, because of Fultz's report, believed that Hill had lied, Dixon did not tell Hill at that meeting what Fultz had reported. Hill therefore had no clue that she should defend herself against a false statement by Fultz. According to the record, Hill did not know about Fultz's lie until it appeared in the written reprimand, which was handed to her a week later, on April 22, 1998. *Compare* J.A. 249A–253 with J.A. 125–26. By that time the decision to discipline Hill had already been made. Second, the dissent says that Hill has not proffered evidence to show (1) that Dixon's erroneous conclusion that Hill had lied to Fultz led to her second reprimand or (2) that if Fultz had not lied, Dixon

would not have reprimanded Hill. *See post* at 689–90. The facts, taken in the light most favorable to Hill, show that she has met her burden at this stage. Dixon acknowledges that he was mad when he confronted Hill because he thought (due to Fultz's report) that Hill had lied to Fultz by telling him that she had already talked to Dixon about the missing cutters. Dixon's deposition testimony reveals that his belief that Hill had lied to Fultz played a key role in the disciplinary action. A jury, in other words, could reasonably find that Fultz's false report substantially influenced Dixon's decision to issue the second reprimand.

13. Because we have concluded that Hill is entitled to pursue her sex and age discrimination claims under the mixed-motive method of proof, we do not consider her alternative argument that she is entitled to proceed under the pretext theory.

she returned from her suspension in late April 1998. Dixon talked with Fultz soon thereafter, J.A. 137, and Fultz immediately began writing discrepancy reports against Hill. Fultz wrote up Hill twice on Thursday, April 30, 1998, three times on Friday, May 1, 1998, and again on Monday, May 4, 1998. Section 704(a) of Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).

■ To defeat Lockheed's motion for summary judgment on her retaliation claim, Hill relies on the three-step, burden shifting framework of *McDonnell Douglas*. Under this framework Hill must begin by establishing a prima facie case of retaliation. She does this by showing that (1) she engaged in protected activity; (2) Lockheed took adverse employment action against her; and (3) there was a causal connection between the protected activity and the adverse action. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir.2001). Hill's complaints to Dixon about Fultz's discrimination constitute protected activity, and termination is an adverse employment action. A causal connection may be inferred when an employee is discharged soon after complaining, and Hill was fired within days of her last complaint and within weeks of her first one. *See, e.g., Carter v. Ball*, 33 F.3d 450, 460 (4th Cir.1994) ("[T]he discharge of an employee soon after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation."). We agree with the district court that Hill "has established a prima facie case of retaliation." J.A. 312.

■ Because Hill has established a prima facie case, the burden shifts to Lock-

heed to proffer evidence of a legitimate, non-retaliatory reason for the discharge. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Lockheed's proffered reason for firing Hill is that in one year she accumulated three written reprimands, one with a suspension, and this was grounds for discharge under the SOP. In short, Lockheed asserts that Hill was fired because the accumulation of three reprimands indicated she was not fit for her job.

■ In the third step under *McDonnell Douglas*, Hill must demonstrate that Lockheed's proffered reason for firing her is pretext for retaliation. The district court concluded that Hill has not come forward with any evidence of pretext and that Lockheed is therefore entitled to summary judgment. To establish a pretext case before *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), Hill would have had to prove that Lockheed's proffered reason was false and then introduce independent evidence that discrimination was the real reason for her discharge. *See, e.g., Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir.1995). However, "the Reeves Court made plain that, under the appropriate circumstances, 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated].'" *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir.2001) (quoting *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097). In other words, "it is *permissible* for the trier of fact to infer the ultimate fact of [retaliation] from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097. Of course, if no rational factfinder could find for the employee, then

summary judgment is appropriate. *See Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir.2000). However, if the plaintiff creates a genuine issue of material fact on whether the proffered reason was pretextual, then the employer must be denied summary judgment.

Lockheed argues that the district court correctly concluded that Hill failed to meet her burden because she has not come forward with any evidence to show (1) that the formal decisionmakers were motivated by retaliation or (2) that Fultz issued the flurry of discrepancy reports in retaliation for Hill's complaints about him.

Both of Lockheed's arguments are without merit. As we discussed in part II.A.2, *supra*, the innocence of its formal decisionmakers does not shield an employer from liability on discrimination claims if an actual decisionmaker (that is, someone with substantial influence on the employment decision) was motivated by illegal considerations. *See Tuck v. Henkel Corp.*, 973 F.2d 371 (4th Cir.1992). For example, an employer is not shielded from liability on a retaliation claim when a formal decisionmaker with no retaliatory motive fires someone based on a poor evaluation by an actual decisionmaker who wrote the poor evaluation in retaliation for protected activity. Here, the formal decisionmakers at Lockheed relied on three written reprimands when firing Hill. Without all three she would not have been eligible for termination, according to Lockheed's SOP. If any of those reprimands were due to Fultz's retaliation, then Lockheed is liable. Hill's third reprimand, which was based on Fultz's discrepancy reports, occurred after

her protected activity. According to Dixon, Hill would not have been fired but for the flurry of discrepancy reports issued by Fultz that led to Hill's third reprimand. Dixon Dep. 31. Therefore, the question is whether Hill raises a genuine issue of material fact about whether Fultz's discrepancy reports were in retaliation for Hill's complaints about his discriminatory comments and conduct.

Lockheed maintains that there is no genuine factual issue because Hill admits that she committed most of the errors noted in the discrepancy reports. However, the question is not whether Fultz *could* have written up Hill's mistakes. The question is whether Hill creates a genuine issue as to whether Fultz *would* have written the reports absent a retaliatory animus. Lockheed inspectors do not automatically issue a discrepancy report for every error. On the contrary, inspectors have discretion on whether or not to write up minor mistakes. Dixon Dep. 27. (We know the errors here were not serious because Fultz designated all of them as "minor.") Fultz concedes that he had this discretion and that he did not issue a discrepancy report every time an employee erred. Fultz Dep. at 37.

We conclude that Hill has offered sufficient evidence to allow a reasonable factfinder to conclude that had Fultz not been gunning for her, he would not have written a discrepancy report on every minor mistake that she made.[14] First off, the timing of the discrepancy reports sets off alarm bells. Fultz's write-ups of Hill followed immediately after Dixon told Fultz that

**14.** Hill's retaliation claim does not fail as a result of her deposition statement that she thought she would have been terminated if she had not complained to Dixon about Fultz. *See post* at 695 & n. 9. That statement came right after Hill testified that Fultz "constant[ly]" accused her of being "a troubled

old lady." J.A. 106. Hill believed, it appears, that Fultz was committed to getting her out of the company as soon as he could, regardless of whether she complained about his discrimination. That belief on Hill's part does not absolve Fultz of retaliation.

Hill had registered a complaint against him. After Fultz learned of Hill's complaint, he wrote up Hill at least once a day every single day—a total of six times in three days—until she was told to go home. A reasonable factfinder could attribute the sudden burst of write-ups to Fultz's retaliation rather than to a sudden deterioration in Hill's work. "When these facts are considered in light of the close temporal relationship ... it is reasonable to conclude that the plaintiff would have a fair chance of demonstrating that she was terminated in retaliation." *King v. Preferred Technical Group,* 166 F.3d 887, 894 (7th Cir.1999) (internal quotations omitted). *See also Evans v. City of Houston,* 246 F.3d 344, 356 (5th Cir.2001) (" '[T]he combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.' " (quoting *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 409 (5th Cir.1999))). There is, of course, more to this than the timing and volume of the discrepancy reports. All of the mistakes noted by Fultz were minor, and one of the discrepancy reports appears to have been unfounded because Dixon refused to sign off on it. Moreover, Hill has presented evidence that Fultz is not being truthful about the discrepancy reports. Fultz claims that at the time he wrote the reports, he had no knowledge of Hill's complaints about him and that he issued the reports solely because of Hill's poor performance. J.A. 160. Yet Fultz's claim conflicts with Dixon's statement that he had spoken to Fultz about Hill's complaints shortly before Fultz began issuing discrepancy reports. Furthermore, Hill's termination statement, which was prepared by Fultz, suggests that he knew about Hill's complaints. Fultz wrote, "Every sign off that E. Lou Hill completes I must look at, *not because I am picking on her,* but because without exaggeration approximately 80% of all her

work is unsatisfactory." J.A. 170 (emphasis added). Why would Fultz deny picking on Hill unless he knew she had made an accusation against him? When asked to explain this, Fultz claimed that he was not aware of Hill's complaint that he had discriminated against her, but he just wanted to make it clear that he was not biased. "I probably inserted that because she is of the female gender," Fultz said. J.A. 160. Dixon's contradiction of Fultz plus Fultz's defensive comment in the termination statement would allow a reasonable factfinder to conclude (1) that Fultz lied when he said that he did not know about Hill's complaints and (2) that he also lied about his reasons for writing the discrepancy reports. This alone could support a finding of pretext. *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 (internal quotations omitted) (noting that it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.").

When all of the factors are considered together, it becomes clear that a reasonable factfinder could determine that Fultz wrote the discrepancy reports in anger because he wanted to retaliate against Hill for her complaints, and not because he wanted to make a fair evaluation of her work. These factors include Fultz's animosity towards Hill because of her sex and age; the timing and volume of the discrepancy reports, which came immediately on the heels of Hill's complaint; and the nature of the discrepancy reports—reporting minor work errors, errors that are not always written up. There is also the issue of Fultz's credibility. He claims that he did not know about Hill's complaints, but that claim is directly contradicted by Dixon. Moreover, Fultz's defensive statement in the termination report indicates that he knew about Hill's complaints. With all of

this evidence, Hill has created a genuine issue of material fact about whether the discrepancy reports that led to her third reprimand were in retaliation for her discrimination complaints. Lockheed is therefore not entitled to summary judgment on Hill's retaliation claim.

## IV.

For the foregoing reasons, we reverse the district court's order granting summary judgment to Lockheed, and we remand the case for a trial on Hill's claims under Title VII, the ADEA, and the New York Human Rights Law.

*REVERSED AND REMANDED.*

TRAXLER, Circuit Judge, dissenting.

With respect, I dissent. Hill, an aircraft mechanic employed by Lockheed, was reprimanded at two separate military jobsites, by two different and admittedly unbiased direct supervisors, for three separate violations of Lockheed's work quality and safety standards. Under Lockheed's standard operating procedures, the three reprimands triggered a termination decision that was imposed by Lockheed's regional supervisor and program manager, who likewise are not charged with harboring any discriminatory animus.

However, because the safety inspector who reported Hill's infractions to her direct supervisor at the last jobsite made derogatory comments to Hill about her age and sex, my friends in the majority conclude that Hill has presented direct evidence that she was instead terminated "because of" her sex and age, entitling her to the more favorable "mixed-motive" method of proof set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). And, they reach this conclusion even though Hill concedes that her direct supervisor issued each reprimand for nondiscriminatory reasons after

independently investigating the safety inspector's reports.

As my colleagues point out, the issue of "whose motives matter" in a discrimination case is an evolving one. The holding today will be that a subordinate employee who has made discriminatory statements is a decisionmaker for *Price Waterhouse* purposes so long as he has what is deemed a "substantial influence" on the process that culminates in the employment decision. I believe this holding expands the scope of the discrimination statutes and *Price Waterhouse* beyond their intended limits. In order to impute the discriminatory motives of a subordinate employee to the formal decisionmakers of an employer, I would require a plaintiff to establish that the subordinate was the "actual decisionmaker" because the formal decisionmakers merely "rubber-stamped" or acted as a "cat's paw" for the subordinate's report, decision, or recommendation. In my view, Hill has failed to establish this causal link between the safety inspector's alleged discriminatory animus and the disciplinary actions taken against Hill. Therefore, I would affirm the district court's grant of summary judgment to Lockheed.

## I.

Hill was employed by Lockheed as an aircraft sheet metal mechanic working with a contract field team. Hill's team was assigned to perform modifications to military aircraft at various military bases in the eastern United States, as called for by contracts between Lockheed and the United States government. Archie Griffin was the east coast senior site supervisor for Lockheed, but was not present at each military jobsite. Rather, Hill and the other aircraft mechanics were directly supervised by a "lead person" or "point of contact" at each base, who reported to Griffin

in the line of authority. The lead person was ultimately responsible for enforcing the standard operating procedures ("SOP") of Lockheed and ensuring that the military contracts were satisfactorily performed at the jobsite.

In addition to the mechanics and the direct supervisor, a safety inspector was assigned to each jobsite. Specific aircraft modifications scheduled to be performed under the military contracts were set forth in modification work orders ("MWOs"). As part of his duties, the safety inspector checked the modifications to ensure that they had been completed in accordance with the required specifications. However, the inspector had no direct supervisory authority over the mechanics, nor any authority to discipline them. Like the mechanics, the safety inspector reported to and worked directly under the supervision of the lead person.

During the last eight months of her employment with Lockheed, Hill received three written reprimands under Lockheed's SOP: (1) a reprimand issued by Ronald Souders, the lead person at Fort Bragg, North Carolina, for a violation of Rule 4 of the SOP—"unsatisfactory quality or quantity of work"—under a MWO assigned to Hill in September 1997; (2) a reprimand and disciplinary suspension issued by Richard Dixon, the lead person at Fort Drum, New York, for Hill's violation of Lockheed's tool control safety policy in April 1998; and (3) a reprimand issued by Dixon for another violation of Rule 4 of the SOP under several MWOs assigned to her in April and May 1998. J.A. 112.

Under Lockheed's SOP 3.4.2, "[a]n employee who receives a combination of two written reprimands not involving a suspension and one involving a suspension (not necessarily on the same rule) will be subject to discharge." J.A. 110. After Richard Dixon issued Hill her third reprimand,

Dixon contacted Archie Griffin and was told to follow the SOP. Dixon then forwarded the disciplinary paperwork to Griffin, who made the decision, along with Thomas Prickett, Lockheed's program manager in charge of the contract field teams, to terminate Hill.

Hill subsequently filed this lawsuit under Title VII and the ADEA alleging that she was reprimanded and terminated by Lockheed "because of" her sex and age and in retaliation for her complaints of discrimination. Hill acknowledges that Souders and Dixon, the lead persons on both the Fort Bragg and Fort Drum jobsites, acted without a discriminatory or retaliatory motive in issuing the three reprimands, and she does not dispute that she violated the standards upon which those reprimands were based. Hill also does not dispute that the three reprimands subjected her to termination under SOP 3.4.2, and she does not allege that Griffin or Prickett acted with a discriminatory or retaliatory motive in terminating her. Rather, Hill's claims of discrimination and retaliation stem wholly from her allegations that Ed Fultz, the safety inspector at Fort Drum, called her a "useless old lady," who needed to be retired, a "troubled old lady," and a "damn woman," on several occasions while they were working together, J.A. 240–241A, 245, and that this discriminatory animus, along with a desire to retaliate against her when she complained to Dixon about Fultz's comments, led Fultz to report the infractions that became the bases for the second and third reprimands issued to Hill by Dixon, and ultimately to her termination.

Concluding that Hill had failed to present sufficient direct or circumstantial evidence to support her claims of discrimination and retaliation by Lockheed's decisionmakers, who issued the reprimands and terminated Hill in the ab-

sence of any such improper motivations, the district court granted Lockheed's motion for summary judgment. Hill, claiming that she had presented sufficient evidence to prove that Fultz was instead the "actual decisionmaker," appealed. I would affirm.

## II.

Title VII forbids "an employer ... to discharge any individual ... *because of* such individual's ... sex." 42 U.S.C.A. § 2000e–2(a)(1) (West 1994) (emphasis added). The ADEA similarly forbids "an employer ... to discharge any individual ... because of such individual's age." 29 U.S.C.A. § 623(a)(1) (West 1999) (emphasis added). Hill alleges that, as a result of Fultz's discriminatory and retaliatory animus, she was disciplined and ultimately terminated by Lockheed "because of" her age and sex, and not "because of" her performance deficiencies.

## A.

There are two avenues of proof by which a plaintiff can establish a claim for intentional discrimination: (1) "mixed-motive" cases, in which the employer is motivated to take an adverse employment action by both permissible and forbidden reasons; and (2) "pretext" cases, in which the employer advances a permissible reason for an adverse employment action, but the reason is pretextual because there is evidence that the employer was in reality motivated by a discriminatory animus. *See Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (4th Cir.1999); *Tuck v. Henkel Corp.,* 973 F.2d 371, 375 (4th Cir. 1992).

A "plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases," *Taylor v. Virginia Union Univ.,* 193 F.3d 219, 232 (4th Cir. 1999) (en banc), if the plaintiff presents

"direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision," *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring). Such proof, however, commands the production of "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* (internal quotation marks omitted); *see also Fuller v. Phipps,* 67 F.3d 1137, 1142 (4th Cir.1995).

If such direct evidence of discrimination is not available, a plaintiff may still establish a discrimination claim utilizing circumstantial evidence and the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff must first establish a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing at a level that met her employer's legitimate job expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *See Brinkley,* 180 F.3d at 607. If a prima facie case is presented, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Assuming the employer meets this burden of production, the burden then shifts back to the plaintiff to prove that the employer's stated reason is pretextual and that she has indeed been the victim of discrimination. *See id.*

## B.

Thus, regardless of the method of proof employed by the plaintiff in a particular case, the ultimate question in every em-

ployment discrimination case is whether the plaintiff suffered adverse employment action "because of" the plaintiff's protected traits. The plaintiff must present sufficient evidence, direct or circumstantial, to establish a causal link between discriminatory animus present in the workplace and the challenged employment decision. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 152–53, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In order to evaluate whether the plaintiff has presented sufficient evidence of intentional discrimination and the requisite causal connection to the challenged employment decision, the majority and I agree that we must first identify the person or persons who actually made the challenged decision on behalf of the employer. And, if that person is different from the person who harbors the discriminatory bias, we must determine whether we can fairly impute the improper motives of the subordinate employee to the formal decisionmaker.

A formalistic approach for determining who is a "decisionmaker" is not appropriate. As noted by Justice O'Connor in *Price Waterhouse,* stray remarks in the workplace do not justify requiring an employer to prove that its decision was based on legitimate criteria, nor do "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden" of proving discrimination. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring); *see also Brinkley,* 180 F.3d at 608. On the other hand, in *Reeves* the Court recently confirmed that the person allegedly harboring discriminatory animus, and making statements reflecting such animus, need not be the "formal" decisionmaker to impose liability upon an employer so long as the plaintiff presents sufficient evidence to establish that the subordinate was the one "principally responsible" for, or the "actual

decisionmaker" behind, the plaintiff's termination. *Reeves,* 530 U.S. at 151–52, 120 S.Ct. 2097.

This point is best illustrated by the facts of the *Reeves* case itself. There, the formal decisionmakers made no discriminatory statements bearing upon the petitioner's termination. However, the Court held that the employer was not entitled to judgment as a matter of law under the *McDonnell Douglas* framework because, "in addition to establishing a prima facie case of discrimination and creating a jury issue as to the falsity of the employer's explanation, petitioner [had] introduced additional evidence that Chestnut," one of petitioner's superiors in the chain of authority, "was motivated by age-based animus and was principally responsible for petitioner's firing." *Id.* at 151, 120 S.Ct. 2097. In particular, Chestnut had told the petitioner "that he 'was so old he must have come over on the Mayflower'" and "that he 'was too damn old to do his job.'" *Id.* (internal alterations omitted). Although Chestnut was not the formal decisionmaker in the termination decision, he had recommended the petitioner's termination to the company president, to whom he was married, and there was testimony from another employee that Chestnut essentially "exercised 'absolute power' within the company." *Id.* at 152, 120 S.Ct. 2097.

Other courts have employed a similar analysis for determining whether a subordinate employee is an "actual decisionmaker" for purposes of a discrimination claim. *See, e.g., Rios v. Rossotti,* 252 F.3d 375, 379 (5th Cir.2001) (noting that "[t]he Supreme Court has assessed the value of discriminatory remarks [by nondecisionmakers] by examining whether the remarks indicated invidious animus and whether the speaker of the remarks was 'principally responsible' for the adverse employment action"). For example, in

*Russell v. McKinney Hospital Venture,* 235 F.3d 219 (5th Cir.2000), the court held that the repeated use of the term "old bitch," when referring to plaintiff, by the son of the president of a parent company, was "appropriate additional circumstantial evidence of age discrimination" under *McDonnell Douglas* because, while not a formal decisionmaker, the president's son was "primarily responsible" for plaintiff's termination. *Id.* at 226. Among other things, there was evidence that the president's son "wielded ... great 'informal' power" within the workplace on a day-to-day basis, *id.* at 228, and had threatened their mutual supervisor, whose budget was controlled by his father, that he would quit if plaintiff were not fired, see *id.* Such leverage, the court held, was sufficient for a jury to tag the son as the person "principally responsible for the plaintiff's firing." *Id.* at 228 (internal quotation marks and alterations omitted).

## C.

Accordingly, my colleagues in the majority and I agree that we cannot always limit our inquiry to the actions or statements of formal decisionmakers, because an employer should not be allowed to insulate itself from liability by hiding behind such formal decisionmakers. I diverge from their holding, however, that a biased subordinate who does not make the final or formal employment decision may count as a decisionmaker in a *Price Waterhouse* mixed-motive case simply because he has had a "substantial influence" on the process which led to the employment decision. In my opinion, more is required to hold an employer liable for the discriminatory motivations of a subordinate employee who participates in the discipline process.

As noted by the majority, many circuits have employed a "rubber-stamp" or "cat's paw" approach as the appropriate means

to prevent employers from unfairly insulating themselves from the consequences of adverse employment actions that are in reality based upon the discriminatory motives of a subordinate employee, while not unfairly tagging employers with the discriminatory motives of subordinate employees who have not been entrusted with formal decision-making authority. I believe this is the better course to follow.

The premise behind the "rubber-stamp" or "cat's paw" analysis is fairly simple. An employer should not automatically be held liable for the discriminatory motivation of a subordinate employee that leads to an adverse employment action for another employee. However, if the formal decisionmakers choose to act in accordance with a report, decision, or recommendation of a biased subordinate without independently evaluating the aggrieved employee's situation, the imposition of liability may be appropriate. If such claims are accepted at face value, the subordinate's discriminatory statements and actions may then be fairly imputed to the formal decisionmakers and, by virtue of them, to the employer. *See e.g., Rios,* 252 F.3d at 382 (noting that "[s]tatements of non decision makers become relevant ... when the ultimate decision maker's action is merely a 'rubber stamp' for the subordinate's recommendation"); *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1231 (10th Cir.2000) (recognizing case law holding that an employer "may be held liable if the manager who discharged the [employee] merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent"); *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 547 (7th Cir. 1997) (noting that "there can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circum-

stances of the case, the employer simply acted as the 'cat's paw' of the subordinate"); cf. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 762, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (recognizing that the "cat's paw" doctrine has been employed by lower courts to impose liability upon an employer for the discriminatory motivations of nondecisionmakers).

In cases like this, where the person harboring the discriminatory animus is not a formal decisionmaker or a direct supervisor, but is in a·position to influence an employment decision, the "cat's paw" analysis is particularly important. It should not be enough to show that a subordinate makes a recommendation or takes an action that is motivated by discriminatory animus, and that the recommendation or action causes the initiation of procedures which ultimately lead to the employment decision made by the formal decisionmakers. Rather, the aggrieved employee should be required to make the threshold showing that the subordinate was the "actual decisionmaker," or the one "principally responsible" for the decision, Reeves, 530 U.S. at 151–52, 120 S.Ct. 2097, because "the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee" and making his own determination as to the propriety of the employment action. English v. Colorado Dep't of Corr., 248 F.3d 1002, 1011 (10th Cir.2001) (quoting Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam)); see also Rios, 252 F.3d at 382 ("Where an evaluation is the sole basis or comprises a substantial basis on which the decision maker acts, the eval-

uation may often constitute sufficient influence to fall under the 'rubber stamp' exception."); Llampallas v. Mini–Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998) (defining a "cat's paw" situation as one in which "the decisionmaker act[s] in accordance with the harasser's decision without herself evaluating the employee's situation").

However, when the formal decisionmakers independently assess the employee's situation, evaluate the propriety of the recommended action and validity of the alleged wrongdoing, and render the employment decision based upon legitimate factors without personal discriminatory motivations, " 'the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken.' " Griffin v. Washington Convention Ctr., 142 F.3d 1308, 1311 (D.C.Cir.1998) (quoting Willis, 118 F.3d at 547); see also Stimpson, 186 F.3d at 1331 (noting that "[w]hen the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee."). In such circumstances, " 'the ultimate decision is clearly made on an independent and a legally permissi[ble] basis, [and] the bias of the subordinate is not relevant.' " Griffin, 142 F.3d at 1311 (quoting Willis, 118 F.3d at 547).[1]

1. I have treated the question of whether a subordinate employee such as Fultz is an "actual decisionmaker" as the threshold inquiry. If the plaintiff presents sufficient evidence upon which the jury can conclude that the formal decisionmaker acted as a "rubber stamp" for the subordinate's recommendation or decision, then we may proceed to the determination of whether the subordinate's statements are properly viewed as "direct" evidence that an illegitimate factor was a motivating factor in his decision and, therefore,

## III.

With these principles in mind, I turn to a more detailed recitation of the facts underlying Hill's reprimands and termination, viewed in the light most favorable to Hill, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and the question of whether Hill has demonstrated that Fultz, the safety inspector at Fort Drum, was the "actual decisionmaker" or the one "principally responsible" for each of these decisions.

### A. *The First Reprimand (Fort Bragg)* [2]

Although not the subject of challenge, the first reprimand is relevant because it is similar to Hill's third reprimand and serves as a predicate for the ultimate termination. The reprimand was issued to Hill during her assignment to Fort Bragg, North Carolina, in September 1997, for "unsatisfactory quality of work," a violation of Rule #4 of the SOP. J.A. 124. Specifically, Hill was reprimanded for installing rivets that were too small to properly hold an antenna mount. Donald Wiggins, the assigned safety inspector, wrote up the violation, which was issued by Ronald Souders, the lead person on the Fort Bragg job. Hill testified that the disciplinary report was accurate and that Wiggins and Souders did not act unfairly in issuing this reprimand or otherwise discriminate against her.

### B. *The Second Reprimand (Fort Drum)*

Hill's second reprimand, by contrast, is the subject of the most contention in this case. In early 1998, Hill was assigned to work at Fort Drum in New York. Dixon was the lead person and Fultz was the assigned safety inspector. Prior to Hill's assignment, Griffin spoke with Hill about complaints he had received about her job performance. Griffin told Hill that her work had not been up to par and that, because the lead persons were ultimately responsible for "the quality of [her] work on the road" and "she had to be followed up on," they had expressed some resistance to her assignment to their sites. J.A. 188.

Hill's second written reprimand, her first at Fort Drum, imposed a three-day disciplinary suspension based upon Hill's violation of Lockheed's tool control policy, which requires employees to accurately account for their tools at all times and to promptly report lost or missing tools to their immediate supervisor. The importance of the policy is not in dispute. As acknowledged by Hill, the policy ensures that "all of the mechanics that are working around the aircraft ... keep track of their tools so they don't get left in the aircraft." J.A. 76. All tools are marked for identification by the mechanic's initials or social security number, and the mechanic's toolbox is outlined, or "shadowed," so that missing tools are immediately apparent when the toolbox is opened.

In April 1998, a pair of blue-handled cutters bearing Hill's identification mark was found on a maintenance stand by military employees and turned in to Fultz, who gave them to Dixon. After consulting with Hill, Dixon issued the following writ-

whether the "mixed-motive" or the "pretext" method of proof is the appropriate one to employ.

**2.** Actually, Hill had received two prior reprimands on a Lockheed jobsite in 1995. Because these reprimands had apparently been removed from Hill's record pursuant to Lockheed's SOPs, they were not considered under SOP 3.4.2. The reprimand issued at Fort Bragg, therefore, was considered to be the first reprimand for purposes of the termination decision.

ten reprimand, in accordance with Lockheed's SOP:

> On 14 April 98 it was brought to my attention that your 4″ Diagonal Cutters with Blue Handle Grips were found on a maintenance stand. You failed to bring it to my attention or the Inspector's attention that you lost or misplaced this tool. These cutters were held in my possession until you discovered they were missing. During Tool Inventory Check at close of business (COB) on 14 April 98, you were questioned as to the whereabouts of these cutters by the Inspector. Your answer: "I told Richard I had taken the tool home." Your toolbox was checked again on 15 April 98 in the morning and again at close of business. When asked if you had all your tools, your answer was "yes."

> On the morning of 16 April 98, after a very in-depth Safety Brief on F.O.D. and Tool Control, your toolbox was checked and a like pair of 4″ Diagonal Cutters were in your toolbox, when I still held your original pair in my possession.

> When I confronted you at approximately 0900 hours on 16 April 98, you denied the 4″ Diagonal Cutters with the Blue Handle Grips, with your tool markings engraved in them, were yours.

J.A. 125–126. At the time the reprimand was issued, Hill's toolbox was only partially "shadowed," a deficiency she corrected during her three-day suspension.

Hill does not dispute that Dixon's decision to issue the reprimand or that the three-day suspension was authorized by Lockheed's disciplinary rules. Indeed, Hill acknowledged that Dixon could have chosen instead to immediately terminate her for the violation. Rather, Hill claims that this valid reprimand issued by Dixon, an unbiased "decisionmaker," was rendered discriminatory by Fultz's involvement in the incident.

As reflected in the written reprimand, Fultz, in addition to turning over the cutters to Dixon, told Dixon that he had earlier noticed that Hill was missing a pair of cutters during a tool inventory check and that, when he questioned Hill about them, Hill told Fultz that "I told Richard [Dixon] I had taken the tool home." J.A. 125. Hill now denies ever discussing the missing cutters with Fultz. The crux of her claim, therefore, is that Fultz was motivated by his discriminatory animus towards her to lie to Dixon about this conversation and that, as a result, Dixon issued a reprimand that he would not otherwise have issued. For the following reasons, I believe Hill has failed to produce sufficient evidence upon which to conclude that Fultz was "principally responsible" for Dixon's decision to issue the reprimand, or that Dixon merely acted as Fultz's "rubber stamp" in doing so.

As an initial premise, the written reprimand for Hill's violation of the tool control policy, completed by Dixon and signed by Hill when they met to discuss the incident, plainly sets forth Fultz's statement to Dixon about the now-disputed conversation with Hill. Dixon did not arbitrarily act to issue a reprimand and suspension for the misplaced tool based upon what Fultz had told him. Hill was presented with the tool bearing her identification mark and notified of the facts related to Dixon about the incident, including Fultz's alleged conversation with her about the missing tool. Faced one-on-one by her direct supervisor, the actual decisionmaker and man that Hill freely professes was acting entirely without a personal discriminatory motivation, Hill was given an opportunity to tell her side of the story and dispute the information she now challenges. There is no evidence that she did so at the time. Nor, for

that matter, is there any indication that she did so during her deposition. Hill's denial of the conversation with Fultz appears for the first time in the form of an affidavit, completed one day before her response to Lockheed's motion for summary judgment and four months after the deposition.

In evaluating whether an employee has been disciplined or terminated "because of" a protected trait, we must "look at the facts as they appear to the person making the decision." *Kendrick*, 220 F.3d at 1231; *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir.1999) (noting that "[t]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."); *see also McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) (holding that plaintiff failed to establish pretext where plaintiff was terminated after the employer conducted an investigation into a subordinate's allegations of misconduct on the part of the plaintiff and believed the allegations to be true, even though plaintiff presented evidence in the lawsuit that the allegations may have been false). Before issuing the reprimand, Dixon informed Hill of the supposed "lie" and gave Hill an opportunity to tell her side of the story or otherwise refute it. It was, in my view, incumbent upon her at that point to do so if she intended to complain later. *See English*, 248 F.3d at 1011 ("A plaintiff cannot claim that a firing authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity to respond to and rebut the evidence supporting the recommendation."); *Willis*, 118 F.3d at 547–48 (holding that the "cat's paw" line of cases was not applicable because the formal decisionmaker investigated the subordinate's motives by

meeting with the plaintiff before acting on the subordinate's adverse recommendation).

In addition, Hill's evidence fails to support the claim that Dixon's conclusion that Hill was less than candid was based entirely on Fultz's report that he had questioned Hill about the misplaced cutters or that Dixon thought Hill lied only because of what Fultz told him. Although Dixon acknowledged that Fultz's statement was considered, as evidenced by its inclusion in the written reprimand, the evidence does not support the conclusion that Dixon would not have exercised his discretion to reprimand Hill had Fultz not made this statement. Dixon testified that if Hill had acknowledged that she was missing a tool, she probably would not have received a written reprimand. J.A. 251A. But, Dixon did not testify that he based his belief that Hill was not being candid on Fultz's statement about the tool being taken home. Rather, as Dixon's testimony clearly demonstrates, his concern was Hill's refusal to admit to him that she had misplaced the tool:

Q: [Fultz] said that Ms. Hill had said that she had talked to you about [the tool] and told you that she had taken it home?

A: Yes, sir.

Q: And, of course, she hadn't?

A: Yes, sir.

Q: But you don't know whether or not she said that to Mr. Fultz?

A: That's hearsay of what he told me.

. . .

Q: Did that alarm you that she had made that statement?

A: It kind of made me mad.

Q: Sure. Because she wasn't telling the truth.

A: Wasn't telling the truth and severe the deal of missing tools [sic].

Q: Okay.... In your mind if she'd said that statement that Mr. Fultz attributed to her, she would have been dishonest?

A: Yes, sir.

Q: And ... the fact that you thought she was being dishonest about it played a role in the discipline, didn't it?

A: Yes, sir.

Q: And, of course, you relied on Mr. Fultz to be honest because that's a serious accusation when an employee is being dishonest?

A: That's right.

Q: Well, if she hadn't been dishonest, you would have treated her in a different way, wouldn't you?

A: ... If she'd acknowledged, "yes, I'm missing a tool," wouldn't nothing ever been said.

Q: Okay. She wouldn't have been written up at all, would she?

A: Probably wouldn't've been wrote up at all.

Q: Okay. When did you ... first talk to Mrs. Hill about it?

A: I talked to her the next morning, I believe. And in her box at that time was a tool. She said it was ... there, she had her tools.

Q: Okay.

A: But I—at the time talking to her, I had the tool in my desk.

. . .

Q: You wrote down in [the reprimand] that ... you showed her the cutters and she denied that they were hers?

A: Yeah. At first she did.

Q: Did she acknowledge it later that they were?

A: Could be hers.

Q: Could be hers. Acknowledged that it had her number of it?

A: Yeah. Had her number and—

Q: Okay. So she did acknowledge it?

A: Yeah. After I—

Q. But based on the history of this, you went ahead and wrote her up and suspended her?

A: Yes, sir.

. . .

Q: So if she hadn't've lied to Mr. Fultz and told [him] that she had did that and then she had come in and ultimately acknowledged that these were hers, you wouldn't have written her up?

A: I wouldn't. There wouldn't've been nothing said.

Q: Because ultimately she did acknowledge it. Right?

A: Yes, sir.

J.A. 251–253. Thus, after Fultz told Dixon about his encounter with Hill, Dixon independently investigated the matter by meeting with Hill and giving her the opportunity to tell her side of the story. At the time, Hill had replaced the missing tool in her toolbox and told Dixon she had all of her tools. When presented with the tool in Dixon's possession that bore her number, Hill only acknowledged that it "*could be hers*" and gave Dixon no reason to disbelieve Fultz's version of the events.

Hill's testimony also contradicts the claim that Dixon based his decision that Hill was not being candid upon Fultz's statement. Hill admits that, at the time Dixon was called upon to make a decision, she only acknowledged that the cutters "had my number on them," and "that's all I said." J.A. 78. Even during her deposition, Hill would only acknowledge that the cutters were "most likely" hers. J.A. 81. And, when she was asked in her deposition

directly whether she had, in fact, lost a pair of diagonal cutters, Hill again refused to own up, testifying instead that, "I had so many, I actually could not answer that." J.A. 78. Later, Hill admitted that she had only owned three pairs of cutters before Dixon gave her the disputed pair, and that she only had three pairs afterwards. But, even then Hill would only admit that she lost a pair of cutters, not *that* pair of cutters, and she raised the possibility that another person could have etched her number on the pair of cutters that was in Dixon's possession. Of course, even if that were true, a pair would still be missing. Given the fact that the very purpose of the tool policy is to ensure that tools are not misplaced in an aircraft where they could wreak havoc and perhaps tragedy, one hardly wonders why Dixon felt it important that his aircraft mechanics be candid when confronted by him about missing tools.

In sum, Hill has presented insufficient evidence to support a finding that Fultz's discriminatory animus caused her to be reprimanded for her violation of the tool control policy or that Fultz's alleged discriminatory motives should be imputed to Dixon. The most that can be said is that Hill created a factual dispute as to whether Fultz discussed the missing tool with her because she has now submitted an affidavit disclaiming any such conversation took place. But, Hill has failed to present any evidence that she challenged that conversation at the time Dixon made his independent decision to reprimand her for her loss of the cutters or to substantiate her current claim that Dixon would not have

issued the reprimand had Fultz not told him about his alleged conversation with Hill. Given Hill's own testimony, it is patently obvious that Dixon's conclusion that Hill was "less than candid" and that a reprimand was warranted did not rest upon Fultz's involvement.[3] *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Factual disputes that are irrelevant or unnecessary will not be counted."). My colleagues conclude that a jury could find that the second reprimand was issued "because of" Hill's sex and age because, viewing the evidence in the light most favorable to Hill, Fultz lied to Dixon about his conversation with Hill and Dixon would not have issued the reprimand had Fultz not done so. In my view, the evidence does not permit such an inference. Accordingly, I would hold that Hill has failed to present sufficient evidence to substantiate a claim that she received her second reprimand "because of" Fultz's discriminatory animus.

### C. *The Third Reprimand (Fort Drum)*

Similarly, I believe that Hill has presented insufficient evidence upon which to recharacterize the equally legitimate third reprimand, which was the triggering event for her termination under Lockheed's SOP, as the product of Fultz's discriminatory animus.

After Hill completed her three-day suspension for the violation of Lockheed's tool control policy, she returned to work at Fort Drum. Over the next few days, Hill was issued six installation discrepancy reports by Fultz for MWOs that Hill had signed off on as completed, but which

---

**3.** I also disagree that Hill was blindsided by Dixon's question because Fultz had not questioned her. The tool control policy requires employees to report missing tools to their supervisor; Fultz was under no obligation to question Hill first. Even if Hill was unaware that she was missing a tool, Hill was present-

ed with a pair of cutters with her identification mark on them and the account of Fultz's involvement that she now disputes. Hill has offered no evidence that she was blindsided by Dixon's simple inquiry as to whether the cutters were or were not hers.

Fultz determined to be unsatisfactory. Once again, Fultz took no disciplinary action, nor was he authorized to reprimand or discipline Hill for the discrepancies. Rather, Fultz, in accordance with his job duties, reported each of his perceived discrepancies, via Lockheed's standard installation "Discrepancy Record." J.A. 128–31. Dixon, in accordance with his job duties, personally investigated the discrepancy records and checked each before it was corrected. With the exception of one, Dixon independently reached the conclusion that all of the installation discrepancy reports were accurate and legitimate write-ups and Dixon spoke with Hill about each discrepancy. For her part, Hill admitted that four of the discrepancy reports were factually correct,[4] and Hill does not question Dixon's authority to issue the reprimand on that basis.

Accordingly, Hill is again faced with the burden of producing sufficient evidence that this valid reprimand, issued by Dixon based on her admittedly inadequate work performance, was rendered discriminatory because Fultz issued the installation discrepancy reports upon which it was based. Hill asserts that she has met this burden because she believes the discrepancy reports issued by Fultz, although accurate, were "nit-picky and trivial," J.A. 83, and that, because they were issued during the same time period that Fultz was uttering discriminatory statements that she had complained about to Dixon, a jury could find that she received the reprimand "because of" her sex and age. I disagree.

As an initial premise, I note that Hill has presented no evidence that similarly situated male or young employees were not issued discrepancy reports for the same or similar deficiencies in their work performance, or that they were not issued written reprimands once such discrepancy reports were verified by the lead person. On the contrary, Hill testified that Fultz had written "many discrepanc[y]" reports for faulty work completed by other mechanics at the Fort Drum worksite during their assignment there, at least one of which resulted in the suspension of a male employee, J.A. at 94–95, and Hill's supervisor at Fort Bragg had issued her first reprimand based upon a single discrepancy report by the safety inspector there.

In addition, even if I accepted the proffered inference that Fultz only issued the reports because of his discriminatory and retaliatory animus towards Hill, I could not agree with the conclusion that this improper animus can be imputed to Dixon. Dixon acted without any personal animus and did not rely solely upon the word of Fultz or "rubber stamp" his findings. The reprimand was issued by Dixon only after Dixon independently verified the accuracy of the discrepancy reports. And, Hill's argument ignores the fact that Dixon, after verifying the accuracy of the reports, independently determined that the infractions were sufficiently serious to warrant

4. Hill's specific testimony on this point is as follows:

Q. And these documents are called discrepancy records?
A. Right.
Q. What is a discrepancy record?
A. It's something that is done wrong or not done.
. . . .
Q. I understand your point that some of these, you believe, are nit-picky?
A. Very nit-picky and trivial.
Q. My question: Are they accurate? I mean, is he right that this is, in fact, what happened, that they weren't done correctly even if you believe it was trivial?
A. Okay. Yeah.
J.A. 82–83.

not only a written reprimand, but the third reprimand that would trigger Hill's termination. Thus, any causal connection between Fultz's animus and the reprimand was broken.[5]

For similar reasons, I am unpersuaded that summary judgment should be withheld simply because the reprimand might not have been issued by Dixon in the absence of Fultz's discriminatory animus towards Hill. Even if true, this is an insufficient basis upon which to impose liability upon an employer who independently verifies such reports. Otherwise, an unbiased employer could never discipline or terminate an employee for an undisputed violation of company rules, including such egregious things as fighting or stealing (or endangering the lives of those who fly on aircraft to which a mechanic has carelessly attended), so long as the employee can demonstrate that she was "turned in" by a subordinate employee "because of" a discriminatory attitude.

### D. *The Termination*

This leaves for consideration Lockheed's ultimate decision to terminate Hill, which rested primarily with Griffin, the senior site supervisor for Lockheed's east coast jobsites, and Prickett, Lockheed's program manager in charge of the contract field teams. As noted previously, Lockheed's SOP 3.4.2 provides that "[a]n employee who receives a combination of two written reprimands not involving a suspension and one involving a suspension (not necessarily on the same rule) will be subject to discharge." J.A. 110. Thus, after Dixon issued the third reprimand to Hill, he sent her home to await final word on her status. Dixon contacted Griffin, who told Dixon to follow Lockheed's SOP.

Dixon then forwarded the disciplinary paperwork to Griffin. At this point, the propriety of Hill's first reprimand at Fort Bragg was wholly undisputed. Hill had not challenged the facts upon which the second reprimand was based, and she was issued that reprimand by Dixon only after he had independently investigated the matter and given Hill an opportunity to tell her side of the story. And, Dixon had issued the third reprimand only after he had independently investigated and verified the discrepancies cited by Fultz and had given Hill had an opportunity to respond to them. In addition to these violations, Dixon testified that Hill was terminated because he "felt like she couldn't do the job anymore" and that, although he declined to specifically recommend her termination, "that's what I told the boss, and he said put the paperwork in." J.A. 150.[6] More specifically, Dixon testified that Hill "could do one job today normal. Tomorrow she would mess it up, and ... you'd tell her that she messed this up and then she'd correct it.... This airplane may be

---

**5.** I am also unpersuaded by Hill's argument that Fultz was the "actual decisionmaker" because Dixon allegedly told Hill that he had no power to override Fultz's actions under the SOP. Viewing Dixon's alleged statement to Hill in the light most favorable to her, it is at best evidence that Dixon was not authorized to arbitrarily override a *legitimate and accurate* discrepancy report issued by a Lockheed safety inspector charging an aircraft mechanic with improper completion of an aircraft modification work order. And, even if true, it does not alter Dixon's ability to evaluate, and verify or reject, discrepancy reports when exercising his sole authority to impose disciplinary action upon the aircraft mechanics under Lockheed's SOP.

**6.** I do not find Dixon's testimony to be inconsistent on this point. In my view, it is not inconsistent for a direct supervisor of an employee subject to termination due to work performance problems to candidly convey his criticisms to a formal decisionmaker, yet decline to specifically recommend the ultimate termination decision.

fine. The next one may be off." J.A. 146. Also, at the time Griffin was presented with this valid paperwork, he was personally aware of the general dissatisfaction Hill had engendered on prior jobsites.

For his part, Fultz had no direct supervisory authority over Hill, but he was in a position to observe the quality of Hill's job performance and to comment upon it. However, viewing the evidence in the light most favorable to Hill, Hill has merely demonstrated that Fultz was consulted by Griffin and that Fultz, who was critical of Hill's work performance, essentially agreed with Dixon's unbiased assessment of Hill's deficiencies. In my view, this does not support the conclusion that Fultz was "principally responsible" for Hill's termination, or that the formal decisionmakers merely "rubber-stamped" Fultz's decision. There is no evidence that Fultz voiced any discriminatory statements or opinions to the formal decisionmakers when he reported Hill's infractions of Lockheed's safety rules and quality standards or when he was contacted by Griffin. Accordingly, I would hold that Hill has presented insufficient evidence to impute Fultz's discriminatory motives to Dixon, Griffin, or Prickett, who clearly made independent and admittedly unbiased decisions to discipline and terminate Hill for her violations of Lockheed's safety and quality standards.

### E. Conclusion

To conclude, I would not impose liability under Title VII or the ADEA upon an employer for the discriminatory motives of a subordinate employee simply because that employee has played a role, even a significant one, in the process that led to the employment decision. In my view, the plaintiff should be required to present evidence that the subordinate was the "actual decisionmaker," or the one "principally responsible," for the decisions leading to her termination because the formal decisionmakers merely rubber-stamped his decisions. I am satisfied that Hill has failed to do so.

To the extent Fultz initiated the process which led to the final two reprimands, he was only "principally responsible" for bringing Hill's shortcomings to light. Fultz was in a position to inspect Hill's work and to report safety and work quality violations to her direct supervisor, Dixon, and ultimately to Griffin. But even if Fultz was motivated to report Hill's infractions in part by discriminatory animus, this is not the situation the Supreme Court contemplated in *Reeves*, in which the "actual decisionmaker" was married to the formal decisionmaker and "exercised 'absolute power' within the company." *Reeves*, 530 U.S. at 152, 120 S.Ct. 2097.[7]

---

7. In this regard, I note that *Tuck v. Henkel Corporation*, 973 F.2d 371 (4th Cir.1992), does not compel a different result. There, the employer, Henkel, contended that formal decisionmakers had fired Tuck because they redefined the job duties of his position as plant manager and found him to be no longer qualified. Tuck, on the other hand, alleged that his former supervisor had demonstrated age-based bias and influenced his termination. We evaluated Tuck's claim under the *McDonnell Douglas* framework and concluded that summary judgment was inappropriate for two reasons. First, Tuck had established

a prima facie case, including its requirement that he was performing his job at a level that met Henkel's legitimate expectations at the time he was discharged. Hill has not. Second, unlike Hill, Tuck had presented an abundance of evidence that the employer's proffered reason was pretextual. In addition to "some probative evidence that [his former supervisor] was biased against older workers and ... influenced" the actual decisionmakers to terminate him, *id.* at 376–77, Tuck presented undisputed evidence that Tuck's first replacement was over 20 years younger that Tuck (and arguably no more qualified),

Nor do I believe Hill has demonstrated that Prickett, Griffin, and Dixon were essentially rubber stamps for Fultz or that Lockheed chose to hide behind its formal decisionmakers. By Hill's own account of the events leading up to her termination, it was Dixon, the lead person and Hill's direct supervisor, who was "principally responsible" for each of the challenged decisions in this case. Dixon issued the final two reprimands only after he independently investigated the underlying bases and gave Hill an opportunity to respond. Dixon sent Hill home to await word as to whether she would be terminated in accordance with Lockheed's policy, and that decision was only made after Griffin, who had been advised of performance problems prior to Hill even going to Fort Drum, had received documentation of the three reprimands and word from Dixon that her performance problems had continued and that her work quality was unreliable. Fultz was asked to work with Dixon to prepare a written report documenting deficiencies, which was forwarded to Griffin.[8] However, the mere fact that a biased subordinate's opinion is solicited during the course of an investigation taken by nondiscriminatory formal decisionmakers should be, in circumstances such as these, insufficient to overcome the fact that the formal decisionmakers reached an independent, non-biased decision.

Under today's decision, if a plaintiff presents evidence that a subordinate employee was motivated to report wrongdoing "because of" the other's protected traits, that discriminatory animus will be imputed to the employer even though unbiased decisionmakers independently investigate and verify the violation, the employee admits the violation, the employer has a preexisting policy of taking the precise employment action as a consequence of the reported violation, and there is no evidence that the employer enforces that policy in a discriminatory fashion. Suppose, for example, Fultz had reported that Hill was stealing from Lockheed and Hill confessed when confronted by Dixon. Griffin, after consulting with Fultz and Dixon, hears nothing to militate against Hill's termination, and Lockheed fires her.

---

and that the second replacement was clearly no more qualified than Tuck, *see id.* at 375–76, as well as "strong anecdotal evidence ... that Henkel fire[d] its employees before they reach [ed] retirement age." *Id.* at 376. Of particular significance, the Director of Human Resources was only able to remember two Henkel employees—both high-ranking officers—who had reached retirement age at the company, and another employee testified that "Henkel's well-known reason for this practice [was] to save on retirement benefits." *Id.* Accordingly, we held, "[i]f it is Henkel's position that it fires older employees 'merely' to save on pension benefits, then the jury should be given the opportunity to consider such a policy as evidence of age discrimination." *Id.*

In sum, *Tuck* is hardly dispositive precedent for a determination that the comments by Fultz, who was not a direct supervisor of Hill, can be construed as direct evidence under *Price Waterhouse* that Hill was terminated by Lockheed "because of" her sex or age and not "because of" the *admitted* performance deficiencies that had been verified by the non-biased decisionmakers within the company.

8. Fultz denied ever talking to Griffin about Hill during the time Griffin was reviewing Hill's infractions of company policy. Since Griffin testified at deposition that there was some discussion between them, I accept at this stage the testimony of Griffin, and I agree with my colleagues that an adverse inference can be drawn as to Fultz from his denial. However, I do not view this inference as sufficient to prevent summary judgment for Lockheed. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Whatever this evidence may say about Fultz, the fact still remains that there is no evidence that Griffin acted with any discriminatory animus, and Hill agrees that Griffin had no such bias. Additionally, I note that the statement Fultz prepared for Griffin is devoid of discriminatory remarks.

Fultz will have single-handedly caused Hill's termination, because he turned her in. Indeed, he has done more than "substantially influence" the outcome; he has precipitated the termination. Under today's holding, Lockheed would be denied summary judgment under the theory that Fultz's statements demonstrating a discriminatory animus should be imputed to Dixon, Griffin, and the other decisionmakers, rendering Hill's termination a violation of Title VII if the jury believes that Fultz was motivated to turn her in because of his discriminatory animus. In my view, Title VII and the ADEA were not intended to impose this burden upon employers.

In sum, I believe that Hill has presented insufficient evidence that Fultz was the "actual decisionmaker" or otherwise "principally responsible" for her discipline and termination, and insufficient evidence that either Prickett, Griffin, or Dixon acted as a mere "rubber stamp" or "cat's paw" for Fultz's discriminatory decisions. Accordingly, I would affirm the district court's grant of summary judgment to Lockheed.

### IV.

Hill's retaliation claim fails for the same reason that her discrimination claims fail. Hill complained to Dixon about her treatment at the hands of Fultz. Hill asserts that she told Dixon that Fultz kept calling her an "old and useless" woman; Dixon asserts that Hill only told her that Fultz was picking on her and yelling at her. The difference in the recollection of the two, however, is unimportant because, even if we assume that Hill complained to

Dixon of the age and sex comments, it is undisputed that Dixon talked to Fultz about the complaint and that Dixon did not discipline or recommend Hill's termination in retaliation for her complaints against Fultz.

Although Hill claims that Fultz retaliated against her by writing her up for a series of infractions, Hill admits that infractions were committed, Dixon personally verified that they were committed, and Dixon independently determined that the write-ups were properly issued. There is no evidence that similar infractions were overlooked when it came to other employees; indeed, the evidence is to the contrary. In addition, Hill herself testified that she believes she would have been terminated even if she had not complained to Dixon.[9] And, Hill has presented no evidence that Griffin or Prickett knew of her complaints about Fultz.

### V.

In view of my belief that Hill has failed to demonstrate that Fultz was the "actual decisionmaker," or that his motivations could otherwise be fairly imputed to the formal decisionmakers, I would not reach the issue of whether the remarks made by Fultz were sufficiently "direct" to invoke the more favorable standards of employer liability available in mixed-motive cases. Because I write in dissent, however, I note briefly my reservations regarding this holding as well.

---

**9.** Hill's testimony on this point is as follows:

Q: Was [Fultz] mad at you because you had complained to Mr. Dixon?

A: That, I don't know. That was my assumption on that.

Q: But you don't have any evidence to support that?

A: No.

Q: Do you think you would have been terminated if you had *not* complained to Mr. Dixon?

A: Oh, yeah.

Q: Do you think you would have been terminated either way?

A: Yeah.

J.A. 106 (emphasis added).

In order to establish a discrimination claim by direct evidence, it is incumbent upon the plaintiff to produce "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor*, 193 F.3d at 232; *see Fuller*, 67 F.3d at 1142. The plaintiff "must produce evidence that clearly indicates a discriminatory attitude at the workplace *and* must illustrate a nexus between that negative attitude and the employment action." *Brinkley*, 180 F.3d at 608 (emphasis added); *see also Maldonado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir.1999) (explaining that direct evidence is "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant" (internal quotation marks omitted)); *Indurante v. Local 705, Int'l Bhd. Teamsters, AFL–CIO*, 160 F.3d 364, 366 (7th Cir.1998) (explaining that direct evidence is "the sort of evidence of discrimination that in itself entitles [a plaintiff] to take [her] case to a jury without disproving [the defendant's] stated rationale for firing [her]").

"[W]hether a case is a pretext or mixed-motive case ultimately hinges on the strength of the evidence establishing discrimination." *Fuller*, 67 F.3d at 1143. In *Price Waterhouse*, the Court found direct evidence of discrimination where partners, who were directly involved in deciding whether the plaintiff would be allowed to join them, were heard to describe the plaintiff as "macho" and as "overcompensat[ing] for being a woman," and directly urged plaintiff directly to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Price Waterhouse*, 490 U.S. at 235, 109 S.Ct. 1775 (internal quotation marks omitted); *see id.* at 277, 109 S.Ct. 1775 (O'Connor, J., concurring); *see also Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir.

2001) (finding that plaintiff was entitled to a Price Waterhouse charge where plaintiff's direct supervisor, the superintendent of the school, had specifically threatened to replace plaintiff with someone "younger and cheaper" on two occasions and later recommended to the school board that she be demoted).

In *Reeves*, by contrast, the Supreme Court did not employ the *Price Waterhouse* direct evidence inquiry to evaluate the discriminatory statements and actions of a lower-level supervisor who recommended the plaintiff's termination, even though the supervisor had told plaintiff "that he was so old he must have come over on the Mayflower" and that he "was too damn old to do his job." *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097 (internal quotation marks and alterations omitted). Rather, the Court concluded that the district court properly submitted the case to the jury because the plaintiff, in addition to establishing a prima facie case and creating a jury issue as to the falsity of the employer's explanation, had produced additional evidence that the supervisor, who was married to the ultimate decisionmaker, was the "actual decisionmaker behind [the] firing," *id.* at 152, 120 S.Ct. 2097, and was "principally responsible" for the firing, *id.* at 151, 120 S.Ct. 2097.

We, too, have more narrowly construed the circumstances under which the general discriminatory statements of nondecisionmakers and other subordinates should be considered as direct evidence of discrimination by the employer. For example, in *Brinkley*, we held that the discriminatory statements by a subordinate who was very popular and highly valued by the ultimate decisionmakers, to the effect that he would have difficulty working for a woman, were insufficient to establish by direct evidence that plaintiff was demoted and terminated because of her sex. *See Brinkley*, 180

F.3d at 608–09. In *Tuck*, we noted that the discriminatory statements of a supervisor, who had recommended and influenced the termination decision, to the effect that he "wanted to get rid of the older people and replace them with 'young blood,'" and that the company needed *"younger people,"* *Tuck*, 973 F.2d at 373, were best evaluated under the *McDonnell Douglas* framework rather than as direct evidence of discrimination, *see id* at 375. And, in *Taylor*, we rejected the plaintiff's claim that the police chief's statement that "he was never going to send a female to the Academy" was direct evidence of discrimination because the statement did not "bear directly on the contested employment decision . . . not to send [plaintiff] to the Police Academy" and the police chief made the statement in response to another employee's question as to whether plaintiff would be attending. *Taylor*, 193 F.3d at 232 (internal quotation marks omitted).

In this case, Fultz made several comments to the effect that Hill was old and useless and that she should retire. There is no evidence, however, that Fultz told Hill "I'm going to get you fired because you are old and female." Majority Op. at 666. Fultz's statements may well have evidenced a discriminatory attitude towards Hill because of her age and sex, but the statements did not "bear directly on the contested employment decision." *Taylor*, 193 F.3d at 232 (internal quotation marks omitted). For the reasons already explained in detail, I believe Hill has failed to "illustrate [the required] nexus between that negative attitude and the employment action." *Brinkley*, 180 F.3d at 608. Accordingly, I am unconvinced that Fultz's statements rise to the level of the direct evidence necessary to invoke the mixed-motive method of proof under *Price Waterhouse*.

## VI.

In my view, the case comes down to this. Fultz made discriminatory remarks about Hill and later reported her for various workplace violations. If the decisionmakers in the discipline process had simply taken Fultz's word that there was wrongdoing on Hill's part and Hill disputed that wrongdoing, then Hill might well have a valid basis to present her Title VII and ADEA claims to a jury.

But that is not what Hill's evidence demonstrates. Instead of blindly taking Fultz's word for it, Dixon personally verified the reports of wrongdoing. He met with Hill face to face, advised her of the reports against her, and gave her opportunities to deny or disprove them. For Hill's work quality errors, he also personally observed Hill's work and confirmed that it was done improperly. These independent investigations by the supervisor allowed him to make an unbiased decision that removed any taint of discrimination that might have otherwise attached to the reports by Fultz. It was these unbiased decisions that were forwarded for review to Griffin, a member of management who Hill concedes also acted without discriminatory bias. Under these undisputed facts, I cannot conclude there is any basis for imputing liability to the company. Therefore, I respectfully dissent.